UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

GEBRIAL RASMY,

                    Plaintiff,

        -against-

MARRIOTT INTERNATIONAL, INC.
d/b/a JW MARRIOTT ESSEX HOUSE HOTEL,
ESTRATUE STAMATIS, individually,
KAREN DOHERTY, individually,
SESSKON PONGPANTA, individually,
TEHRANI MEHRANI, individually,

                    Defendants.

-------------------------------------------------------------------X

Civil Case No: 1:16-cv-04865-AJN

**PLAINTIFF'S OPPOSITION TO DEFENDANTS 56.1 STATEMENT & PLAINTIFF'S 56.1(b) ADDITIONAL DISPUTED FACTS**

       Pursuant to this court's Local Civil Rule 56.1, and Judge Nathan's Individual Rules, Plaintiff submits the following statement of material facts as to which there are genuine issues for trial, in opposition to Defendants' Motion for Summary Judgment.

1. Gebrial Rasmy, also known as Kamal, was born in Egypt and identifies as a Coptic Christian. (Pl. Tr. 24:2-4, 37:3-22, 39:8).[1]

   **RESPONSE: Disputed.** Gebrial Rasmy, also known as Kamal, was born in Egypt and is a devout Coptic Christian and follows the teachings of Jesus Christ. Rasmy attends church 3 days a week. Rasmy does not "identify" as Coptic Christian. Rasmy is a Coptic Christian. (Pl. Tr. 24: 2-25, 25: 1-22, 27: 16-23, 28: 6-9).

2. Defendant Marriott International, Inc., d/b/a JW Marriott Essex House New York ("Marriott"), is a leading global lodging company which, among other things, manages the JW Marriott Essex House, located at 160 Central Park South in Manhattan (the "Essex House").

   **RESPONSE: Undisputed.**

---

3. Defendant Karen Doherty ("Doherty") is the Director of Human Resources for the Essex House. She was born in the U.K. and identifies as Christian. (Doherty Decl., ¶¶ 2-3).

**RESPONSE: Undisputed.**

4. Defendant Stamatis "Steve" Efstratiou ("Efstratiou") was born in Greece, identifies as Orthodox Christian, and, like Rasmy, works at the Essex House as a banquet server. (Efstratiou Tr. 7:8-10, 10:4-6, 10:16-18).[2]

**RESPONSE: Disputed.** To the extent Defendant Stamatis "Steve" Efstratiou ("Efstratiou") was born in Greece and works at the Essex House is not disputed. To the extent Efstratiou is an Orthodox Christian is disputed. ("[*Efstratiu*] believes the idea of God is garbage. Religions are for the stupid people. [*sic*].. [*Efstratiu* is] not an Orthodox Christian. He's an atheist that doesn't believe in God." (Rasmy Tr. 400: 12-24).

5. Defendant Mehran Tehrani ("Tehrani") was born in Iran, is a non-practicing Muslim with a Catholic wife and children, and works at the Essex House also as a banquet server. (Tehrani Tr. 10:5-6, 67:12-16).[3]

**RESPONSE: Undisputed.**

6. Defendant Sekson "Alex" Pongpanta ("Pongpanta"), was born in Thailand, attended a Buddhist church, and works at the Essex House also as a banquet server. (Pongpanta Tr. 6:16-18, 10:12-16, 11:6-22).[4]

**RESPONSE: Undisputed.**

---

[2] Select pages of the transcript of the deposition of Stamatis Efstratiou (July 20, 2017) ("Efstratiou Tr.") are attached as Ex. 2 to the Saloman Decl.

[3] Select pages of the transcript of the deposition of Mehran Tehrani (July 28, 2017) ("Tehrani Tr.") are attached as Ex. 3 to the Saloman Decl.

[4] Select pages of the transcript of the deposition of Sekson Pongpanta (July 20, 2017) ("Pongpanta Tr.") are attached as Ex. 4 to the Saloman Decl.

7. Plaintiff began working as a banquet server at the Essex House in the 1990s. (Pl. Tr. 30:7-10).

   **RESPONSE: Undisputed.**

8. At all relevant times, the Essex House banquet servers' employment was governed by a collective bargaining agreement ("CBA") negotiated with the Motel Trades Council, AFLCIO (the "Union"). (Docket Entry 19, pp. 16-25).

   **RESPONSE: Undisputed.**

9. The unionized Essex House banquet servers elect their own co-workers to serve as delegates to the Union. (Doherty Tr. 24:2-13;[5] Efstratiou Tr. 32:3-10; Tehrani Tr. 35:22 to 36:4).

   **RESPONSE: Undisputed.**

10. Union delegates provide support and assistance to Essex House associates represented by the Collective Bargaining Agreement who may have disputes related to their job and/or the CBA. (Doherty Tr. 28:17 to 29:9; Efstratiou Tr. 31:20-22; Tehrani Tr. 37:18-22).

    **RESPONSE: DISPUTED.** Union Delegates do not provide complete "support and assistance," to associates at the Essex House represented by the Collective Bargaining Agreement (CBA) who may have disputes with management as they relate to their job and/or the CBA. Union Delegates repeatedly refused to represent Gebrial Rasmy - an associate under the CBA - in workplace disputes. Delegates repeatedly refused to represent Rasmy while representing others for the same conduct. (Efstratiou Tr. 34: 18-22; 35: 4-8; Tehrani Tr. 40: 8 to 42: 24).

11. In this sense, delegates occasionally act as an intermediary between Essex House associates and the Union and/or Essex House management. (Doherty Tr. 28:17 to 29:16; Efstratiou Tr. 31:6-13).

    **RESPONSE: DISPUTED.** Plaintiff disputes to the extent response to ¶10 is incorporated herein.

12. Union delegates receive no additional compensation for these duties. (Doherty Tr. 33:14-19; Efstratiou Tr. 31:23-24; Tehrani Tr. 23:2-5).

    **RESPONSE: Undisputed.**

---

[5] Select pages of the transcript of the deposition of Karen Doherty (July 26, 2017) ("Doherty Tr.") are attached as Ex. 5 to the Saloman Decl.

13. Union delegates have no authority to fire, hire, discipline, or otherwise exercise supervision over associates, including Rasmy. (Doherty Tr. 36:18-23; Efstratiou Tr. 65:21-22; *see also* Pl. Tr. 106:2-3 ("The delegate cannot terminate anybody.")).

    RESPONSE: DISPUTED. Defendants' "fact" in ¶ 13 contains a conclusion of law as to the status of Union Delegates and the supervisory authority they exercise. Union Delegates had the power to exercise supervision over association, including Rasmy.(Efstratiou Tr. 63: 18 to 64: 22; Pongpanta Tr. 15: 7 to 16: 13; 50: 3-13; 53: 8-12; Tehrani Tr. 22: 12 to 23: 24; 24: 25 to 25: 25; 27: 3-5; 27: 20-25; Rasmy Tr. 282:14-25,283: 1-25; 284: 17-25,285:2-18,288: 10-21).

14. At all relevant times, Efstratiou, Tehrani, and Jonathan Thompson (the "Delegates") served as union delegates for the most senior banquet servers (also known as the "AList"), including Rasmy. (Efstratiou Tr. 29:22-24; Tehrani Tr. 35:22-25).

    RESPONSE: DISPUTED. Efstratiou, Tehrani, and Jonathan Tompson were union delegates for most senior servers (also known as "A-List" servers) including Rasmy, but they did not "serve" Plaintiff Rasmy in any way. (Efstratiou Tr. 34: 18-22; 40: 13-14; 43: 5-12).

15. Prior to June 2013, Rasmy and Tehrani were friends outside of work, visiting each other's homes and spending time with each other's families. (Pl. Tr. 281:2-13; Tehrani Tr. 12:1324).

    RESPONSE: DISPUTED. Prior to September 2012, Rasmy and Tehrani were friends outside of work, visiting each other's homes and spending time with each other's families. (Tehrani Tr. 12:22-24; 13: 17-19; Rasmy Tr. 281: 2-25; 282: 1-2).

16. At the time of his termination, Rasmy had worked together with Tehrani, Pongpanta, Efstratiou at the Essex House for more than 20 years. (Pl. Tr. 82:2-6; Efstratiou Tr. 12:20-23; Tehrani Tr. 11:16-20; Pongpanta Tr. 9:3-12).

    RESPONSE: Undisputed.

17. During Rasmy's employment, the Essex House was controlled by several different management groups and owners over the years, including Nikko

Hotels International, Starwood Hotels, and the Jumeirah Group.   (Pl. Tr. 30:7-10, 43:12-21, 68:20 to 69:3; Doherty Tr. 77:1319).

RESPONSE: Undisputed.

18. In or around September 2012, Marriott began managing the Essex House. (Doherty Tr. 77:13-16).

RESPONSE: Undisputed.

19. Marriott is an equal opportunity employer with instituted policies and procedures to protect its associates from unlawful discrimination, harassment, and/or retaliation.  (Doherty Decl., ¶ 4).

RESPONSE: DISPUTED. This fact is disputed to the extent Marriott failed to take corrective, remedial, or preventative action when Plaintiff Rasmy brought forward claims of race, national origin, and religious discrimination and therefore is not an equal opportunity employer. (Doherty Tr. 156: 18-22; Rasmy Tr. 325: 12-19).

20. As part of its transition after it began managing the Essex House, Marriott trained the banquet team in 2012 on the Company's policies prohibiting, among other things, discrimination and harassment.  (Doherty Tr. 49:20 to 50:2).

RESPONSE: Undisputed.

21. After Marriott began managing the Essex House, a transition team consisting of above-property resources arrived at the property to assist with the change in management.   (Doherty Tr. 60:2-17; Tehrani Tr. 24:16-24).

RESPONSE: Undisputed.

22. The transition team and other managers asked the Delegates to assist in banquet function scheduling and educating Marriott managers on banquet department pay practices to insure Marriott complied with the details and nuances of the CBA and the written and unwritten past practices associated with banquet department operations.  (Doherty Tr. 74:13 to 75:7; Tehrani Tr. 22:12-19 ("I helped them with scheduling and assist[ed] them, assist[ed] all the new managers that came in September with scheduling, according to our Local 6 collective bargaining agreement and past practices, and I assisted them with work assignments[.]"), 23:6 to 24:24, 58:14-25).

RESPONSE: DISPUTED. Defendants did not simply "ask" Delegates for help.

Defendants imputed onto the Delegate-defendants supervisory authority. (Rasmy Tr. 90:2-3; 91: 5-9; 103: 15-17; 337: 4-11; Efstratiou Tr. 63: 18 to 64: 22; Pongpanta Tr. 15: 7 to 16: 13; 50: 3-13; 53:8-12; Tehrani Tr. 22: 12 to 23: 24; 24: 25 to 25: 25; 27: 3-5; 27: 20-25). Defendants did not comply with details and nuances of the CBA and the written and unwritten past practices associated with banquet department operations. In fact, Defendants disregarded past practices. (Rasmy Tr. 83: 19-24). Additionally, Defendant Efstratiu had the power to send employees home. (Rasmy Tr. 336: 6-9).

23. Rasmy was unaware that Marriott management had made this request of the Delegates. (Pl. Tr. 82:10-16).

   **RESPONSE: DISPUTED.** Marriott made it very clear to Plaintiff that they were granting supervisory authority to certain delegates. (Rasmy Tr. 86: 5-19; 87: 2-23; 90: 5-9).

24. In or around late 2012, Rasmy told Doherty that associates were abusing scheduling practices. (Doherty Tr. 89:7 to 90:21; Pl. Tr. 282:20 to 284:16).

   **RESPONSE: Undisputed.**

25. Rasmy also alleged the Delegates were abusing their "power" and engaging in practices which caused Marriott to lose money. (Doherty Tr. 89:7 to 90:21).

   **RESPONSE: Undisputed.**

26. Because Marriott maintains a zero tolerance policy for theft, (Doherty Tr. 224:2025), Doherty investigated these serious charges with then-Director of Event Planning Jay Jones and Director of Food and Beverage Martin Mariano. (Doherty Tr. 96:17 to 97:25; 103:12-17).

   **RESPONSE: Undisputed.**

27. Based on her investigation, Doherty told Rasmy the concerns he raised were permitted past practices under the CBA and would continue. (Doherty Tr. 97:8-14, 103:22-25).

   **RESPONSE: DISPUTED.** Karen Doherty told Rasmy "I am sick and tired of this shit, and I'm sick and tired also because of you I have to send tons of fucking documents to [Arne Sorenson] because you have called the corporate about possible overcharging." (Rasmy Tr. 145: 2-7; 379: 3-9).

28. Doherty considered the issues raised by Rasmy to be resolved. (Doherty Tr. 130:18-23) ("I believe that the steps that had been taken had resolved the situation. There was a long period of relative peace and quiet and everybody conducting business as normal.").

**RESPONSE: DISPUTED.** This is not a statement of fact. Doherty's belief is irrelevant. Doherty believing an issue is resolved or not is not a question of fact. Whatever Ms. Doherty believed, the fact remains that Rasmy continued to be paid improperly. (Rasmy Tr. 80: 8-9,91: 6-24).

29. Rasmy became unhappy that Tehrani (at management's request, unbeknownst to Rasmy) was making changes to work assignments because Rasmy believed Tehrani was abusing his "power" as a delegate when he performed tasks previously performed by managers. (Pl. Tr. 103:14-17, 282:9 to 284:4; Tehrani Tr. 25:16-22, 59:13 to 60:6).

**RESPOSNE: DISPUTED.** Disputed. Defendants gave Delegate-defendants supervisory authority. As such, Delegate-defendants purposefully and continuously materially alerted Rasmy's working conditions. (Rasmy Tr. 90: 2-3; 91: 5-9; *supra* ¶ 13).

30. On June 5, 2013, Rasmy got into an altercation with Tehrani over Tehrani filling out pay or assignment sheets. (Pl. Tr. 82:17 to 85:12; Tehrani Tr. 58:11 to 63:8).

**RESPONSE: DISPUTED.** Defendants' citation to the record is inaccurate. Defendants cite to Pl. Tr. 82: 17 to 85: 12 to support their contention that "Rasmy got into an altercation with Tehrani..." Nowhere within the cited record above does Plaintiff Rasmy say he confronted Tehrani. In fact, Rasmy's deposition reflects the opposite: "I don't remember approaching Tehrani." (Rasmy Tr. 83: 11-12; 101: 5-8).

31. Eyewitness Maggie Cantalupo (Senior Event Manager) saw Rasmy "kept getting closer to Tehrani and it looked like there was a risk of escalation to physical contact." (Saloman Decl., Ex. 6).

**RESPONSE: DISPUTED.** Plaintiff accepts to the extent Maggie Cantalupo gave a statement, but the underlying statement and the facts and circumstances of the event are in dispute. (Rasmy Tr. 83: 11-12; 101:5-8; *supra* ¶ 30).

32. Shortly after his dispute with Tehrani, Rasmy attended a grievance meeting in June 2013 with the Union regarding his unrelated altercation with manager Jones, also on the same day—June 5, 2013. (Pl. Tr. 73:2 to 75:12).

RESPONSE: DISPUTED. Whether a "dispute" occurred is still a question of fact. (Rasmy Tr. 83:11-12; 101: 5-8; *supra* ¶ 30). To the extent a grievance meeting took place is not disputed.

33. During that grievance meeting in June 2013, Rasmy publicly accused the Delegates of overcharging the Essex House and wage theft. (Pl. Tr. 358:15 to 359:2).

RESPONSE: Undisputed.

34. Several people attended this meeting, including associate (and bartender delegate) Carlos Brown and other Union representatives. (Pl. Tr. 360:16-18, 375:14-22).

RESPONSE: Undisputed.

35. Following the June 2013 meeting, word spread among the banquet servers that Rasmy accused the Delegates and other banquet servers of stealing from the Essex House. (Pl. Tr. 360:16-18 ("After this meeting, the news was all over the place because Carlos Brown was sitting there."), 375:14-22; *see also* Tehrani Tr. 112:16-23 (Brown and a Union representative told Tehrani of Rasmy's theft allegations)).

RESPONSE: DISPUTED. In or around November of 2012, wage theft violations were made public. (Doherty Tr. 85: 12-32, 86:4-10).

36. During a meeting in late July 2013, Rasmy raised his same theft complaints a third time, again to Doherty. (Doherty Tr. 135:17 to 136:21).

RESPONSE: Undisputed.

37. Doherty provided Rasmy with contact information for Marriott's Business Integrity Line, an above-property resource, in case he wished to escalate his complaints to the next level. (Doherty Tr. 124:4 to 125:16 ("I didn't believe there was anything further that I could

RESPONSE: Undisputed.

38. Doherty's investigation into the June 5 dispute between Rasmy and Tehrani continued into September 2013. (Doherty Decl., ¶ 5).

**RESPONSE: Undisputed.**

39. On or about September 28, 2013, Rasmy told Doherty he heard Efstratiou tell Tehrani to "send the old man home," allegedly referring to an older banquet server. (Pl. Tr. 335:224; Doherty Decl., ¶ 6).

**RESPONSE: DISPUTED.** The alleged fact mischaracterizes testimony. "[Plaintiff], Mr. Mekouar, Mr. Lunzer and Mr. Mustafa, had come to human resources to complain that Mr. Efstratiu had called one of his colleagues an old man." (Doherty Tr. 138: 4-10).

40. Efstratiou denied making the remark about his co-worker (Efstratiou Tr. 82:23 to 83:11), and Marriott received a statement signed by 19 banquet servers and bartenders asserting Efstratiou did not say "send the old man home." (Saloman Decl., Ex. 7).

**RESPONSE: DISPUTED.** Plaintiff Rasmy heard Efstratiu refer to another colleague as "the old man." (Rasmy Tr. 335: 14-18).

41. Though Marriott's investigation could not substantiate Rasmy's allegation, Doherty reminded Efstratiou that such language was improper. (Doherty Decl., ¶ 7; Doherty Tr. 141:7-15).

**RESPONSE: Undisputed.**

42. Nearly four months after his June 5, 2013 altercation with Tehrani, Rasmy delivered a letter to management on October 2, 2013, reiterating his (mistaken) belief that Tehrani should not be making changes to service diagrams. (Saloman Decl., Ex. 8).
**RESPONSE: DISPUTED.** To the extent a letter was delivered is not in dispute, to the extent Rasmy's beliefs were "mistaken," is. (Tehrani Tr. 25: 17-25; 27: 3-5).

43. Rasmy's letter made no mention of any discrimination or harassment based on religion, national origin, or race. *Id.*

**RESPONSE: Undisputed.**

44. To address the allegations raised against and by Rasmy, Marriott reiterated and reinforced its Policy Prohibiting Harassment and Unprofessional Conduct (the "Harassment Policy") to the entire banquet staff, including Rasmy, in October 2013. (Saloman Decl., Ex. 9; Doherty Decl., ¶ 8; Doherty Tr. 50:2-22).

**RESPONSE: DISPUTED.** Defendants did not reiterate and reinforce any policy to Rasmy. (Rasmy Tr. 316: 7-20).

45. Among other things, the Policy Prohibiting Harassment and Unprofessional Conduct mandates all associates must "treat each other with courtesy, consideration and professionalism," and confirms that "[t]he company will not tolerate harassment of any associate by another associate[.]" *Id.*

**RESPONSE: DISPUTED.** Defendants did not reiterate and reinforce any policy to Rasmy. (Rasmy Tr. 316: 7-20).

46. Associates who violate the Harassment Policy are "subject to discipline up to and including termination." *Id.*

**RESPONSE: DISPUTED.** Defendants did not reiterate and reinforce any policy to Rasmy. (Rasmy Tr. 316: 7-20).

47. At the time the Harassment Policy was issued, Doherty had received complaints from other associates and one manager about Rasmy's unprofessional and disruptive behavior. (Doherty Tr. 51:17 to 53:17).

**RESPONSE: DISPUTED.** Defendants did not reiterate and reinforce any policy to Rasmy. (Rasmy Tr. 316: 7-20).

48. Therefore, Doherty personally delivered the anti-harassment policy to Rasmy, who acknowledged receipt of the document by signing it. (Pl. Tr. 323:18 to 324:3; Saloman Decl., Ex. 9; Doherty Decl., ¶ 9).

**RESPONSE: Undisputed.**

49. On or about October 25, 2013, Essex House management (including Doherty) also held a special training meeting for the entire banquet staff. (Pl. Tr. 319:14-21; Doherty Decl. ¶).

**RESPONSE: DISPUTED.** Defendants did not reiterate and reinforce any policy to Rasmy. (Rasmy Tr. 316: 7-20).

50. One purpose of this meeting was to educate the staff on different Marriott and CBA banquet practices and to clear up apparent confusion in the department. (Doherty Tr. 51:19 to 52:9).

**RESPONSE: DISPUTED.** Plaintiff disputes to the extent he did not participate in the referenced meeting. (Rasmy Tr. 316: 7-20).

51. Marriott management also delivered a PowerPoint presentation, which included a slide confirming "Conduct and Behavior unbecoming of a JW Marriott Associate will not be tolerated." (Saloman Decl., Ex. 10).

**RESPONSE: DISPUTED.** Plaintiff did not participate in any PowerPoint presentation. (Rasmy Tr. 316: 7-20).

52. Marriott management discussed this standard with the entire banquet staff, including Rasmy. (Doherty Tr. 51:25 to 52:9).

**RESPONSE: DISPUTED.** Plaintiff did not participate in any PowerPoint presentation. (Rasmy Tr. 316: 7-20).

53. Marriott management also warned that harassment, name-calling, and other unprofessional conduct would not be tolerated. (*Id.*).

**RESPONSE: DISPUTED.** Plaintiff did not participate in any PowerPoint presentation. (Rasmy Tr. 316: 7-20).

54. During the October 31, 2013 meeting, Rasmy again publicly accused Efstratiou and Tehrani of manipulating schedules and engaging in wage theft. (Doherty Tr. 127:11 to 128:20; Pl. Tr. 319:14-21).

**RESPONSE: DISPUTED.** Plaintiff did not participate in any PowerPoint presentation. (Rasmy Tr. 316: 7-20).

55. Management again addressed pay practices at the meeting to provide clarity to Rasmy and the rest of the banquet department. (Doherty Tr. 51:17 to 52:3, 66:6 to 68:8).

**RESPONSE: DISPUTED.** Plaintiff did not participate in any PowerPoint presentation. (Rasmy Tr. 316: 7-20).

56. Doherty also reminded everyone in attendance that discrimination and retaliation were prohibited at the Essex House. (Doherty Decl., ¶ 10).

**RESPONSE: DISPUTED.** To the extent Doherty may have "reminded everyone" that "discrimination was prohibited," is in dispute, as Plaintiff did not participate in any PowerPoint presentation. (Rasmy Tr. 316: 7-20).

57. After the October 2013 meeting, Marriott considered Rasmy's concerns resolved.   (Doherty Decl., ¶ 11).

   **RESPONSE: Undisputed.**

58. Indeed, on or about November 22, 2013, Marriott management received a note signed by most of the banquet servers thanking management for holding the meeting and anticipating everyone will move forward. (Saloman Decl., Ex. 11).

   **RESPONSE: Undisputed.**

59. In or about late November 2013, Rasmy called the Business Integrity Line, a hotline associates can utilize to raise concerns with Marriott's corporate headquarters directly.   (Pl. Tr. 351:14-19; Saloman Decl., Ex. 12).

   **RESPONSE: Undisputed.**

60. Area Director of Associate Relations Sue Birnie investigated Rasmy's renewed allegations of wage theft.   (Saloman Decl., Ex. 12; Doherty Decl., ¶ 12; Tehrani Tr. 110:6-11).

   **RESPONSE: DISPUTED.** Sue Bernie investigated wage theft, but failed to investigate Rasmy's complaints of harassment and retaliation in the workplace. ("I have told [Sue Bernie] about the poor treatment I have received from Karen. And I have told her about her being hostile to me and my legitimate complaint. And I have told her about incident where proving to her that I have been harassed... I have told her about the racial slurs and the shaming and the condescending and the insults. (Rasmy Tr. 352: 13-23).

61. Like Doherty, Birnie also concluded Rasmy's accusations against the Delegates were unfounded. (Saloman Decl., Ex. 12).

   **RESPONSE: DISPUTED.** Sue Birnie only investigated alleged wage theft. Birnie ignored harassment and retaliation complaints. (*supra* ¶ 60).

62. In or around late 2013, Rasmy informed Doherty that Efstratiou and Tehrani allegedly called him a "rat." (Doherty Tr. 150:24 to 151:16).

   **RESPONSE: DISPUTED.** Plaintiff Rasmy reported to Defendants on-going discrimination in the workplace and the use of other terms, beyond simply "rat."

(Rasmy Tr. 399: 19 to 400: 19; 404: 14-17; 405: 11-25; 406: 2-22.; 409: 10 to 410:12).

63. Doherty conducted a prompt and thorough investigation. The Delegates denied the accusation and Doherty could not substantiate it otherwise. (Doherty Tr. 153:5-10 ("I found that there was no substance of proof attached his being called a 'rat.' There were no witnesses, no dates, no times, nothing that I could document and return and address with the individuals, the accused individuals.")).

RESPONSE: DISPUTED. Plaintiff Rasmy reported to Defendants on-going discrimination in the workplace and the use of other terms, beyond simply "rat." (Rasmy Tr. 399: 19 to 400: 19; 404: 14-17; 405: 11-25; 406: 2-22.; 409: 10 to 410:12; *supra* ¶ 62). Additionally, Doherty's investigation was lackluster and ineffective to help combat the on-going hostile work environment. (*supra* ¶ 19).

64. Doherty nonetheless warned Efstratiou and Tehrani that, if true, such behavior was prohibited under Company policy. (Doherty Tr. 151:13-16).

RESPONSE: DISPUTED. Plaintiff accepts that one time Karen Doherty gave a lackluster investigation but disputes whether any preventative measures or discipline was implemented. (Doherty Tr. 151: 13-16).

65. In or about May 2014, Rasmy called the Business Integrity Line a second time regarding "theft" in the banquet department. (Saloman Decl., Ex. 13).

RESPONSE: DISPUTED. Plaintiff called and reported wage theft in addition to complaining about on-going harassment and retaliation. (Rasmy Tr. 354: 25 to 355: 8).

66. Birnie again investigated and found no wrongdoing by the Delegates. (*Id.*).

RESPONSE: Undisputed.

67. In the summer of 2014, Doherty investigated a claim Efstratiou asserted *against* Rasmy, namely that Rasmy allegedly threatened Efstratiou. (Doherty Tr. 139:17-25).

RESPONSE: DISPUTED. Both Efstratiou and Rasmy brought up alleged discriminatory comments and conduct during the referenced meeting. (Doherty Tr. 139: 17-25; 140: 2-11).

68. During her interview of Rasmy in late 2014 or early 2015 concerning Efstratiou's allegation, Rasmy told Doherty for the first time that Efstratiou had called Rasmy "fucking Egyptian," "camel," and "mummy." (Doherty Tr. 139:25 to 140:11).

**RESPONSE: DISPUTED.** Doherty knew or should have known of the on-going harassment well before late 2014. (Doherty Tr. 50: 6-22; 52: 10 to 53: 2).

69. Rasmy (nearly six feet tall and more than 200 pounds) never reported being physically threatened by the smaller Efstratiou. (Pl. Tr. 176:14 to 177:2; Doherty Decl., ¶ 13).

**RESPONSE: Undisputed.**

70. The Delegates denied Rasmy's claim and it could not be substantiated through other witnesses. (Doherty Tr. 148:16 to 149:10, 154:11 to 155:11).

**RESPONSE: Undisputed.**

71. Doherty nonetheless warned the Delegates that such name-calling, if true, was improper and would not be tolerated. (Doherty Tr. 149:7-10; 154:22 to 155:2).

**RESPONSE: Undisputed.**

72. In January 2016, Rasmy drove to Marriott's corporate headquarters in Bethesda, Maryland. He spoke with Keith Wallace, Senior Director Global Investigation and renewed his allegations of wage theft against the Delegates. (Pl. Tr. 378:14 to 379:16).

**RESPONSE: DISPUTED.** Rasmy brought up the wage-theft as well as harassment and retaliation to Keith Wallace. (Rasmy Tr. 389: 22 to 390: 16; 393: 17 to 394: 8; 395: 12 to 396: 15).

73. In or around February 2016, Wallace investigated Rasmy's wage theft allegations. As part of the investigation, Wallace conducted a site visit to the Essex House and interviewed several Marriott banquet servers. (Pl. Tr. 384:14 to 385:16).

**RESPONSE: DISPUTED.** Disputed. To the extent Keith Wallace may have investigated wage theft is not in dispute. To the extent Wallace ignored and did not investigate Rasmy's complaints of discrimination and retaliation is in dispute. (*supra* ¶ 72).

74. Like Doherty and Birnie, Wallace was also unable to substantiate Rasmy's claims of wrongdoing by the Delegates or other banquet servers. (Doherty Decl., ¶ 14; Pl. Tr. 389:2225).

**RESPONSE: DISPUTED.** Disputed to the extent Defendants failed to take any corrective action or help rectify or combat the on-going harassment. (*supra* ¶ 19, 72, 73).

75. In the evening of May 9, 2016, Rasmy and Pongpanta worked at an event in the Essex House's Southgate restaurant. (Pl. Tr. 171:3-18; Pongpanta Tr. 81:22 to 82:16).

**RESPONSE: Undisputed.**

76. Near the close of the event, a dispute arose between Rasmy and Pongpanta in the hallway between the restaurant and the kitchen. (Pl. Tr. 171:19 to 176:6; Pongpanta Tr. 82:17 to 87:20, 95:4 to 98:24, 101:4-9).

**RESPONSE: Undisputed.**

77. There are no surveillance cameras pointing into the hallway. Therefore, no video footage of the altercation exists. (Doherty Tr. 207:23 to 208:2).

**RESPONSE. DISPUTED.** A video camera exists in the hallway. (Rasmy Tr. 172: 3-14; Pongpanta Tr. 56: 7-14).

78. Marriott promptly investigated the incident by, among other things, interviewing witnesses, taking statements from Pongpanta and Rasmy, and reviewing available security video from nearby cameras. (Doherty Tr. 198:5 to 199:5; 207:11 to 208:2). Because of the lack of cameras in the hallway, the altercation was not captured on video. (Doherty Tr. 207:23 to 208:2).

**RESPONSE: DISPUTED.** Plaintiff disputes to the extent response to ¶ 77 is incorporated herein.

79. During the investigation, Pongpanta reported that Rasmy tried to strike Pongpanta with a wooden board; called Pongpanta a "piece of s**t" and threatened to take him "outside"; and took a swing a Pongpanta, spat in his face, and asked him to step outside. (Doherty Tr. 203:9 to 204:4; Pongpanta Tr. 112:19 to 114:19; Saloman Decl., Ex. 14).

**RESPONSE: DISPUTED.** Plaintiff accepts the fact that Pongpanta reported to Defendants certain false, misleading, and unsubstantiated claims. Clearly there still exists disputable facts as to what happened between Pongpanta and Rasmy on May 9, 2016. (Rasmy Tr. 179: 20-24).

80. Rasmy reported Pongpanta spat in his face and purportedly told Rasmy that he was going to get his gun and "finish" Rasmy. (Pl. Tr. 186:22 to 189:11, 190:15-20).

**RESPONSE: UNDISPUTED.**

81. The primary eyewitness to the altercation, R.M.,[6] told Marriott Rasmy was "speaking profanity to" Pongpanta and "verbally harassing" him "in a violent angry manner." (Saloman Decl., Ex. 15).[7]

**RESPONSE: DISPUTED.** Pongpanta spit in Rasmy's face and yelled at Rasmy "You got no fucking witnesses. I got witnesses." (Rasmy Tr. 179: 20-14). To the extent these "witnesses" corroborated a disputed facts (*supra* ¶ 79), this fact is in dispute.

82. Rasmy then became "very aggressive" toward R.M., approached him "in an intimidating manner and stated, 'Are you going to be witness for him now?'" *Id.*

**RESPONSE: DISPUTED.** Pongpanta spit in Rasmy's face and yelled at Rasmy "You got no fucking witnesses. I got witnesses." (Rasmy Tr. 179: 20-14). To the extent these "witnesses" corroborated a disputed facts (*supra* ¶ 79), this fact is in dispute.

83. Rasmy and Pongpanta both filed reports against the other with the local police precinct. (Pl. Tr. 190:7-9; Pongpanta Tr. 116:17-24).

**RESPONSE: UNDISPUTED.**

84. On May 14, 2016, Marriott suspended Rasmy and Pongpanta pending further investigation. (Saloman Decl., Exs. 16 and 17).

**RESPONSE: UNDISPUTED.**

85. Rasmy conceded the misconduct of which he stood accused was very serious. (Pl. Tr. 224:23 to 225:11 ("Q: Would you agree with me that being accused of spitting in someone's face is a serious offense at Marriott? A: Yes.")).

**RESPONSE: UNDISPUTED.**

---

[6] To protect their privacy, associate witnesses are identified herein only by first and last initials.
[7] A second eyewitness, C.R., confirmed Rasmy and Pongpanta were "having an altercation" but was unable to provide additional detail. (Doherty Tr. 206:16 to 207:10).

86. After the suspensions were implemented, Marriott received letters from Rasmy's peers raising past instances of Rasmy's grossly unprofessional conduct, [Examples omitted].

**RESPONSE: DISPUTED.** Pongpanta spit in Rasmy's face and yelled at Rasmy "You got no fucking witnesses. I got witnesses." (Rasmy Tr. 179: 20-14). To the extent these "witnesses" corroborated a disputed facts (*supra* ¶ 79), this fact is in dispute. Additionally, Plaintiff posits facts that co-workers were coerced, threatened, and intimidated into signing petitions against Plaintiff. (Rasmy Tr. 397: 22-24).

87. Marriott ultimately terminated *both* Rasmy *and* Pongpanta for the May 9 incident, effective May 24, 2016. (Saloman Decl., Exs. 24 and 25).

**RESPONSE: Undisputed.**

88. Marriott treated Rasmy and Pongpanta exactly the same. (*Compare* Saloman Decl., Exs. 16 *with* 17; Exs. 24 *with* 25; Doherty Tr. 197:3-25; *see also* Doherty Tr. 214:5-16 ("I believed that both parties were culpable and that we should terminate both employees.").

**RESPONSE: Undisputed.**

89. Though Doherty could (and did) recommend termination, the decision to terminate Rasmy and Pongpanta was made by the business leaders. (Doherty Tr. 214:20 to 215:9).

**RESPONSE: Undisputed.**

90. Pongpanta promptly filed a grievance through the Union over Marriott's decision to terminate his employment. (Doherty Tr. 216:18-24; Pongpanta Tr. 124:13-16).

**RESPONSE: Undisputed.**

91. At the first-step grievance meeting, Marriott refused to reinstate Pongpanta. (Doherty Tr. 219:4-8).

**RESPONSE: Undisputed.**

92. At the second-step grievance mediation, Marriott again refused to reinstate Pongpanta. (Doherty Tr. 219:20 to 220:3; Pongpanta Tr. 125:19-25).

**RESPONSE: Undisputed.**

93. Following the unsuccessful mediation, the Union pursued arbitration over Pongpanta's termination. (Doherty Tr. 220:3-8; Pongpanta Tr. 126:11-24).

**RESPONSE: Undisputed.**

94. Rasmy failed to appear at the proceeding despite service of a valid subpoena. Over Marriott's objections, and due largely to Rasmy's absence, the arbitrator awarded Pongpanta reinstatement. (Doherty Tr. 220:3-8; Pongpanta Tr. 126:23 to 127:2; Saloman Decl., Ex. 26).

**RESPONSE: Undisputed.**

95. To this day, Doherty respectfully disagrees with the arbitrator's decision to reinstate Pongpanta. (Doherty Tr. 220:9-13).

**RESPONSE: Undisputed.**

96. Though he had ample opportunity to do so, Rasmy never filed a grievance through the Union appealing his termination (Pl. Tr. 216:9-12), and his position remains vacant today. (Doherty Decl., ¶ 15).

**RESPONSE: Undisputed.**

97. Instead, he filed the lawsuit at bar on June 22, 2016. (Dkt. No. 2).

**RESPONSE: Undisputed.**

## ADDITIONAL MATERIAL FACTS TO WHICH IT IS CONTENDED THAT THERE EXISTS A GENUINE ISSUE TO BE TRIED:

1. Plaintiff Rasmy is a devout Coptic Christian. (Efstratiu Tr. 101: 14-17; Pongpanta Tr. 63: 20 to 64: 6; Tehrani Tr. 67: 16-23).

2. Plaintiff Rasmy worked at the "Essex House" (what is now owned and operated by Defendants) for 25 years. (Doherty Tr. 94: 7-14).

3. In the early '90s – at what is now Defendants' hotel – Plaintiff Rasmy reported wage theft to his corporate office. Within a week, his report was verified and individuals were escorted out of work in handcuffs. (Rasmy Tr. 382: 18-24; 383: 6 to 384: 13).

4. Before 2012, Defendants Tehrani, Pongpanta, and Efstratiu were professional and friendly with Plaintiff. On multiple occasions, Defendants Tehrani, Pongpanta, and Efstratiu hung out with Plaintiff outside of work and on separate occasions slept over Plaintiff's house. (Pongpanta Tr. 12: 16-18; Efstratiu Tr. 158: 14-21; Tehrani Tr. 12: 25 to 14: 12).

5. In 2012, after Plaintiff Rasmy reported wage theft, Defendants Efstratiu, Pongpanta, and Tehrani began to subject Rasmy to constant discrimination (Rasmy Tr. 421: 5-8, "Mr. Efstratiu had taken a great pride that Egyptian do the dirty work in Greece like Mexican in United States. That Greeks are the only pure race, lived on the same land for 3,000 years. That Egyptian have been occupied all their history. They never had one of them told them till 1952 and he mix it up with all kinds of racism [sic]. [Efstratiu] also stated on several occasions – he never call me by my name after that meeting. He used to refer to me while I'm passing by him, He's a fucking Egyptian rat. He's a fucking mummy. Where's the

fucking mummy? Is this his table? All kinds of things. And that went on and on and on and on.") (Rasmy Tr. 399: 17 to 400: 19, "… as soon as I walk in the kitchen [Pongpanta] says, Here is the Egyptian mother fuck," or "He's a mummy mother fucker.") (Rasmy Tr. 193: 6-10).

6. In 2012, after Plaintiff Rasmy reported wage theft and discrimination, Defendants (and the Delegates) began to ban together to sabotage Plaintiff's career. Defendants retaliated and continued to harass Plaintiff by writing "petitions" against him. (Efstratiu Tr. 140: 2-16; 144: 15 to 145: 12; Tehrani Tr. 48: 14-17).

7. After 2012, Defendant-delegates Stamatis, Tehrani, and Pongpanta pressured individuals to falsely accuse Plaintiff of workplace improprieties (Rasmy Tr. 333: 18 to 334: 10).

8. In 2012, after Plaintiff Rasmy reported wage theft, the Union Delegates refused to represent Rasmy. (Tehrani Tr. 115: 16-24).

9. Plaintiff Rasmy made multiple complaints of religious, national origin, and race discrimination to Defendant's Manager "John," Karen Doherty, Defendants' corporate hotline, Nancy Lee, and Defendant's Director "Teddy." (Doherty Tr. 186: 9 to 187: 4; Rasmy Tr. 193: 2-18; 406: 3 to 407: 5). No action was ever taken to help combat or end the discrimination.

10. Doherty repeatedly disregarded Plaintiff's complaints of harassment and discouraged Plaintiff from opposing unlawful discrimination. ("I am sick and tired of this shit and I'm sick and tired also because of you I have to send tons of fucking documents to [Arne Sorenson]." (Rasmy Tr. 144: 20 to 145: 14).

11. Doherty discouraged Rasmy from reporting discrimination in the workplace. In

fact, Doherty told Plaintiff "You better keep your fucking mouth shut if you want to keep your job here." (Tr. Rasmy. 203: 21-25).

12. In or around 2013, Doherty called Rasmy to her office and accused him of grabbing Defendant Stamatis and attempting to pick him up and throw him on a slicing machine. Doherty then held up a CD and claimed to have the altercation captured on camera. Doherty refused to show Rasmy the footage. (Rasmy Tr. 140: 9 to 144: 9). Thereafter, Rasmy hired an attorney to seek the CD and any evidence on it. (Rasmy Tr. 406: 12-15).

13. Because of Defendants' complete indifference to the on-going discrimination, eventually, the situation escalated to a physical altercation; on May 9, 2017, Defendant Pongpanta spit is Plaintiff's face. (Rasmy Tr. 179: 20-24).

Dated:     September 21, 2017
           New York, New York

                                    **DEREK SMITH LAW GROUP, PLLC**
                                    *Attorneys for Plaintiff*

                                    Zachary Holzberg, Esq.
                                    Alexander G. Cabeceiras, Esq.
                                    30 Broad Street, 35th Floor
                                    New York, NY 10004