**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

GEBRIAL RASMY,

          Plaintiff,

v.

MARRIOTT INTERNATIONAL, INC.
d/b/a JW MARRIOTT ESSEX HOUSE NEW
YORK, ESTRATUE STAMATIS, individually,
KAREN DOHERTY, individually, SESSKON
PONGPANTA, individually, and TEHRANI
MEHRANI, individually,

          Defendants.

No: 16-cv-4865-JSR

**DEFENDANTS' CONSOLIDATED MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTIONS *IN LIMINE***

       Defendants Marriott International, Inc. ("Marriott") and the individually-named defendants

("Defendants") move: (1) to exclude evidence and testimony at trial regarding Plaintiff's alleged

financial losses the period from March 11, 2017 to the present because Plaintiff became

permanently disabled on that date due to physical impairments sustained *after* his employment

with Marriott ended.   Capping back pay—and dismissing his front pay claim—due to his

permanent disability is warranted because Marriott is not responsible for injuries Plaintiff

sustained outside its workplace; (2) bifurcate the trial as to the determination of Plaintiff's back

pay and front pay awards as such remedies under Title VII are equitable in nature, and accordingly,

are questions to be determined by the Court, not the jury. Bifurcation of these issues will promote

judicial efficiency by limiting the presentation of evidence and testimony relating to damages until

a finding of liability is made; (3) bar Plaintiff from introducing medical records; (4) preclude

Plaintiff from referring to or offering any testimony, to Marriott's current financial position, or

wealth, or comparing the wealth or size of Marriott to that of Plaintiff, (5) exclude evidence and testimony referring to Plaintiff as a "victim" or "victimized"; (6) exclude evidence and testimony concerning the existence of any medical opinions, diagnoses, discussions of treatment modalities or opinions as to causation offered by the Plaintiff, non-medical opinion witnesses, and/or laypersons; (7) exclude evidence and testimony regarding what health care providers have told Plaintiff; (8) exclude evidence and testimony concerning Defendants' decision not to call available witnesses; (9) exclude evidence and testimony regarding Plaintiff's Charges of Discrimination filed with the New York Division of Human Rights and/or United States Equal Employment Opportunity Commission; (10) exclude evidence and testimony regarding alleged discriminatory remarks made by non-decisionmakers; (11) exclude evidence and testimony regarding inflammatory racial slurs not reported by Plaintiff to management; (12) Richard Swartz should be precluded from testifying at trial; (13) exclude evidence and testimony regarding the secret audio recording that Plaintiff made of his suspension discussion, including any transcript of same; (14) exclude Plaintiff's untimely disclosure of an August 11-13, 2013 email chain.

## RELEVANT FACTUAL BACKGROUND[1]

### A.    The Parties

Gebrial Rasmy, also known as "Kamal," was born in Egypt and is a Coptic Christian. Defendant Marriott manages the JW Marriott Essex House ("the Essex House"), where Plaintiff has worked as a banquet server since the 1990s. Efstratiou, born in Greece, Tehrani, born in Iran, and Pongpanta, born in Thailand, also work as banquet servers at the Essex House. Doherty, born in the United Kingdom, is the Director of Human Resources for the Essex House. The banquet

---

[1] The facts are taken directly from the Court's summary judgment ruling ("Ruling").  *See Rasmy v. Marriott Int'l, Inc.*, 343 F. Supp. 3d 354, 358-62 (S.D.N.Y. 2018), *vacated and remanded*, 952 F.3d 379 (2d Cir. 2020).

servers' employment was governed by a collective bargaining agreement ("CBA") negotiated with the New York Hotel and Motel Trades Council, AFL-CIO (the "Union"). The banquet servers elect their own co-workers to serve as delegates to the Union; the delegates act as intermediaries between the workers and the Union and Essex House management, but receive no additional compensation for these duties. At all relevant times, Efstratiou and Tehrani served as Union delegates for the senior banquet servers, including Rasmy. (Ruling at 359).

**B.     Initial Complaints (2012-2013)**

In or around September 2012, Marriott took over the management of the Essex House, and soon after conducted training for the banquet team on the company's policies prohibiting discrimination and harassment. In late 2012, Rasmy told Doherty that associates were abusing scheduling practices, abusing their "power," and engaging in practices that caused Marriott to lose money. Doherty and others investigated these charges. Based on Doherty's investigation, she informed Rasmy that the concerns he raised were permitted past practices under the CBA and would continue. *Id.*

After Doherty's investigation, Rasmy remained unhappy that Tehrani, one of the delegates, was "abusing his 'power.'" Rasmy got into an altercation with Tehrani on June 5, 2013, and an eyewitness stated "it looked like there was a risk of escalation to physical contact." (Ruling at 360).

Shortly after this dispute, Rasmy attended a grievance meeting with the Union regarding an unrelated altercation that occurred the same day.  At that meeting, Rasmy publicly accused the delegates of overcharging the Essex House and of wage theft.  One month later, Rasmy raised the same theft complaints to Doherty again. Doherty gave Rasmy the contact information for Marriott's Business Integrity Line, and continued an investigation of the "dispute" between Rasmy

and Tehrani. In September 2013, Rasmy and others told Doherty they heard Efstratiou tell Tehran to "send the old man home," referring to an older banquet server, and although Marriott's investigation could not substantiate the allegation, Doherty reminded Efstratiou that such language was improper. In October 2013, Rasmy delivered a letter to management reiterating his belief that Tehrani should not be changing the service diagrams. *Id.*

In October 2013, the company reinforced its Policy Prohibiting Harassment and Unprofessional Conduct to the entire banquet staff, including holding a special training meeting on or about October 25, 2013. Rasmy received the anti-harassment policy from Doherty and acknowledged receipt by signing the document. One week later, Marriott claims it delivered a PowerPoint presentation and discussed the behavior standard with the entire banquet staff, at which presentation Rasmy publicly accused Efstratiou and Tehrani of manipulating schedules and engaging in wage theft, charges which management answered. *Id.*

In November 2013, Rasmy called the Business Integrity Line, and Area Director of Associate Relations Sue Birnie investigated Rasmy's renewed allegations of wage theft, concluding that they were unfounded. Additionally, Rasmy approached Doherty with allegations that Efstratiou and Tehrani called him a "rat." Doherty investigated and could not substantiate the allegations but warned Efstratiou and Tehrani that such behavior was prohibited by company policy. (Ruling at 360-61).

**C.      Further Investigations and Alleged Altercations (2014-2016)**

In or about May 2014, Rasmy called the Business Integrity Line again concerning his wage theft claims and Birnie again investigated and found nothing to substantiate the allegations.

In the Summer 2014, Doherty investigated a claim Efstratiou asserted against Rasmy, namely that Rasmy allegedly threatened him. During her investigation, Rasmy told Doherty for

the first time that Efstratiou had called him "f*cking Egyptian," "camel," and "mummy." Doherty, who could not substantiate Rasmy's claims, nonetheless warned the delegates that name-calling would not be tolerated. (Ruling at 361).

In January 2016, Rasmy drove to Marriott's corporate headquarters in Maryland and spoke with Keith Wallace, Senior Director of Global Investigations, about his allegations of wage theft. Wallace investigated Rasmy's wage theft claims and could not substantiate them. *Id.*

On May 9, 2016, Rasmy and Pongpanta worked at an event together.  Near the end of the night, a dispute arose between them in the hallway between the restaurant and the kitchen. Marriott promptly investigated the incident, in which Pongpanta reported that Rasmy tried to strike him with a wooden board, called him a "piece of shit," threatened to take him "outside," took a swing at him, and spat in his face.  Rasmy reported that Pongpanta spat in his face and told Rasmy that he would get his gun and "finish" Rasmy. The primary eyewitness to the altercation told Marriott that Rasmy was "speaking profanity to" Pongpanta and "verbally harassing" him "in a violent angry manner." Rasmy claims that Pongpanta yelled at him, "You got no fucking witnesses. I got witnesses," and the eyewitness claims Rasmy became "very aggressive" toward the eyewitness, approached him "in an intimidating manner" and stated, "Are you going to be witness for him now?" Rasmy and Pongpanta filed reports against each other with the local police precinct. *Id.*

On May 14, 2016, Marriott suspended Rasmy and Pongpanta pending further investigation. After the suspensions were implemented, Marriott received letters from Rasmy's peers raising past unprofessional conduct. Plaintiff does not dispute the letters' existence. *Id.*

D.    **Plaintiff's Termination**

Marriott terminated both Rasmy and Pongpanta for the May 9 incident, effective May 24, 2016. Both Rasmy and Pongpanta were treated the same, and the decision to terminate them, while

recommended by Doherty, was made by the business leaders. Pongpanta filed a grievance through the Union and Marriott refused to reinstate Pongpanta both at the first-step grievance meeting and at the second-step grievance mediation. When mediation was unsuccessful, the Union pursued arbitration over Pongpanta's termination. Rasmy failed to appear at the arbitration despite service of a subpoena and, over Marriott's objections and due largely to Rasmy's absence, the independent arbitrator ordered Pongpanta's reinstatement. Rasmy never filed a grievance through the Union and instead sued on June 22, 2016. (Ruling at 361-62).

## <u>ARGUMENT</u>

I.    **THE COURT SHOULD LIMIT EVIDENCE CONCERNING PLAINTIFF'S ALLEGED BACK PAY, AND DENY FRONT PAY, BECAUSE HE BECAME PERMANENTLY DISABLED MONTHS AFTER HIS EMPLOYMENT WAS TERMINATED—THROUGH NO FAULT OF MARRIOTT.**

Plaintiff's alleged back pay and front pay awards (if any) should exclude the timeframe in which he became disabled and unable to work through the present. The purpose of Title VII remedies, including back pay and front pay, is to make the successful employee whole. *Iannone v. Frederic R. Harris, Inc.*, 941 F. Supp. 403, 411 (S.D.N.Y. 1996) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418-19 (1975)). Such employees should be "restored to the economic position they would have occupied but for the intervening unlawful conduct of employers." *Id.* (internal citations omitted). Importantly, Title VII plaintiffs "should not be made more than whole; that is, they should not receive a windfall." *Id.* (citing *Munnelly v. Memorial Sloan Kettering Cancer Center*, 741 F. Supp. 60, 62 (S.D.N.Y. 1990). Accordingly, a back pay award may compensate a plaintiff only for lost wages and benefits. *Id.* (internal citations omitted).

In determining back pay and front pay awards, courts will not permit a plaintiff to recover damages for time periods during which he or she physically could not work or when a claim was made in another legal proceeding that the plaintiff was incapable of working. *See Thornley v.*

*Penton Publ.*, 104 F.3d 26, 31 (2d Cir. 1997) ("The remedy in a discriminatory discharge case is intended to compensate a plaintiff only for 'losses suffered as a result of defendant['s] discrimination,' and does not extend to granting back pay for a period when a plaintiff would have been unable, due to an intervening disability, to continue employment."); *see Schlant v. Victor Belata Belting Co.*, No. 94-CV-0951 E(Sc), 2001 U.S. Dist. LEXIS 16539, at *3, n.3 (W.D.N.Y. Oct. 2, 2001) ("Plaintiff had become totally disabled and unable to work two weeks after her wrongful discharge; accordingly this Court held that her entitlement to front and back pay ended as of that date"); *see Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993) (affirming the district court's denial of front and back pay after the date plaintiff became disabled and could no longer work for the defendant-employer in a Title VII action,); *Tart v. Elementis Pigments Inc.*, 191 F. Supp. 2d 1019, 1025 (S.D. Ill. 2001) (excluding the two months that the plaintiff was "totally disabled and industrially unemployable" from the back pay calculation in an ADA action); *see EEOC v. Independent Stave Co., Inc.*, 754 F. Supp. 713, 721 (E.D. Mo. 1991) (awarding back pay from discharge until date of disability).

Here, Marriott terminated Plaintiff's employment on May 24, 2016. Dkt. 182: Saloman Decl. at Exh. A ("Amended Complaint"), at ¶ 75. Plaintiff subsequently obtained new employment at the Surrey Hotel on August 18, 2016. *See* Dkt. 182: Saloman Decl. at Exh. B ("Surrey Hotel Employment Records"), Employee Summary. Nine months after his termination, Plaintiff's employment with the Surrey Hotel ended on March 11, 2017 because of an alleged workplace injury he suffered on March 10, 2017. *See id.*, Employer's Report of Injured Employee's Change in Employment Status. Because of that workplace injury, MRIs revealed a rotator cuff tear of his right shoulder on March 29, 2017; a superior labral tear and a posterior superior and posterior inferior labral tear of his left shoulder on April 19, 2017; and mild disk disruption and bulging at

the L4-L5 and L5-S1 levels on August 24, 2017. *See id.* at Exh. H ("Medical Records from Spine and Orthopedic Center of New Jersey"), p. 55–61, 95–104.

Plaintiff also was involved in a motor vehicle accident on January 31, 2018, resulting in severe internal disk disruption and disk herniations at the L4-L5 and L5-S1 levels with nerve root impingement, and internal disk disruption and disk bulging at the C5-C6 level with kyphotic deformity. *Id.* As a result of both post-Marriott injuries, Plaintiff's treating physician confirmed Plaintiff is "permanently disabled and unable to return to work in any capacity." *See id.* at p. 82– 84. Because Plaintiff cannot work due to his workplace injury, any back pay or front pay awards must be limited as of March 11, 2017 based on his inability to work due to his disability. *See Schlant*, 2001 U.S. Dist. LEXIS 16539, at *3, n.3.

Plaintiff contends he should be entitled to introduce evidence of his economic loss beyond March 10, 2017, the date Plaintiff became permanently disabled, because he would not have been injured at his *second* post-Marriott job (and *third* position) "[b]ut for Plaintiff's termination from Marriott." Plaintiff's argument is unfounded.

*First*, Plaintiff cites one 40 year-old, non-binding case from outside the Second Circuit for this proposition. Yet federal courts in New York hold precisely the opposite: plaintiffs are "only entitled to be compensated for injuries suffered as a direct result of the discrimination." *Schlant v. Victor Belata Belting Co.*, No. 94-CV-0915E(SC), 2000 WL 1737945, at *1 (W.D.N.Y. Nov. 9, 2000) (plaintiff entitled to back pay only through the day she became permanently disabled because she could not prove her employer's discrimination caused her to become disabled) (citing *Saulpaugh v. Monroe Community Hospital*, 4 F.3d 134, 144–145 (2d Cir. 1993)); *Townsend v. Exch. Ins. Co.*, 196 F. Supp. 2d 300, 307 (W.D.N.Y. 2002) ("Both the *Schlant* and *Saulpaugh* courts found that if a plaintiff is disabled, the time period of the disability should be excluded from

a possible award. This is because a plaintiff is entitled to losses suffered 'as a result' of defendants' discrimination: since the plaintiff would not have been entitled to a salary while disabled, the losses the plaintiff suffered were not the result of discrimination."); *Hampson v. State Farm Mut. Auto Ins. Co.*, No. 112CV258BKSCFH, 2015 WL 12733388, at *4 (N.D.N.Y. Oct. 22, 2015); *Hamilton v. Niagara Frontier Transp. Auth.*, No. 00-CV-300SR, 2008 WL 4724324, at *2 (W.D.N.Y. Oct. 24, 2008) ("The remedy in a discriminatory discharge case is intended to compensate a plaintiff only for losses suffered as a result of defendant's discrimination, and does not extend to granting back pay for a period when a plaintiff would have been unable, due to an intervening disability, to continue employment."). Because Marriott did not proximately cause Plaintiff's injury or permanent disability, Plaintiff cannot be permitted to seek back pay or front pay beyond March 10, 2017 as a matter of law.

*Second*, the facts of Plaintiff's single cited case are inapposite. There, the court determined the employer's termination of the plaintiff's position as lobby manager resulted in the plaintiff accepting a blue collar position requiring strenuous physical labor to which plaintiff was unaccustomed, resulting in injury to his back. The record confirms the opposite here. Indeed, Plaintiff's position as a Banquet Server with Marriott required him to engage in physically labor-intensive activities (setting up and breaking down banquet hall events). Indeed, Plaintiff's job description expressly provides he was responsible to "[m]ove, lift, carry, push, pull, and place objects weighing less than or equal to 50 pounds without assistance and objects weighing in excess of 75 pounds with assistance." *See* **Doc. 208: Exhibit 2**. Because Plaintiff was accustomed to physical labor at Marriott, no reasonable jury could believe Marriott forced Plaintiff to accept an unfamiliar blue collar job. *See Sutera v. Rochester City Sch. Dist.*, No. 11-CV-6057-FPG, 2014 WL 4245957, at *3 (W.D.N.Y. Aug. 26, 2014) ("The Supreme Court has further instructed that

'[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts") (*citing Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

Moreover, Plaintiff's first job after his employment was terminated by Marriott was a comparable Server role at the Crowne Plaza Hotel—*not* the subsequent Housekeeping role in which he was injured. *See* **Doc. 208: Exhibit 3**: Rasmy Tr. 424:24 to 425:25. Plaintiff was hired by the Crowne Plaza (with no Marriott involvement) on July 1, 2016, but quit less than a month later on July 20, 2016. *See* Rasmy Tr. 424:24 to 425:25; **Doc. 208: Exhibit 4**: Plaintiff's Employment Records from Highgate Hotels.   After Plaintiff left the Crown Plaza (again, with no Marriott involvement), he was hired by the Surrey Hotel on or about August 18, 2016 as a Room Service Attendant. *See* Rasmy Tr. 433:15 to 434:21; **Doc. 208: Exhibit 5**: Plaintiff's Employment Records from Surrey Hotel at p. 3.   Then, on or about September 16, 2016, Plaintiff decided— again, without Marriott's involvement—to voluntarily accept the (allegedly) more physically demanding Housekeeping position at the Surrey Hotel. *See* Rasmy Tr. 433:15 to 434:21; **Doc. 208: Exhibit 5** at p. 3.   Thus, Marriott cannot be the cause of his injury at the Surrey Hotel because Marriott was uninvolved with *Plaintiff's* decisions to (i) abandon his employment as a Server at the Crowne Plaza; (ii) leave his Room Service role at the Surrey Hotel; *and/or* (iii) accept the more strenuous Housekeeping position at the Surrey Hotel. As the undisputed facts and law confirm, Plaintiff's post-termination permanent disability was *not* caused by Marriott's termination of Plaintiff's employment nine months earlier.   Evidence of these alleged damages after May 10, 2017 should be excluded.

II.   **THE COURT SHOULD BIFURCATE THE TRIAL AS TO THE DETERMINATION OF BACK PAY AND FRONT PAY AWARDS**.

There is no right to demand a jury trial under Title VII of the Civil Rights Act of 1964 in determining remedies. *Flores v. International Brotherhood of Electrical Workers*, 407 F. Supp. 218, 219 (E.D.N.Y. 1976). The remedies available under Title VII are exclusively equitable in nature. *Id.* Accordingly, the determination of back pay and front pay awards is reserved for the Court. *Id.*

Likewise, the trial court has the authority to order bifurcation of an issue where such an order will further convenience, avoid prejudice, or promote efficiency pursuant to Fed. R. Civ. P. 42(b). *See, e.g., D'Cunha v. Genovese/Eckerd Corp.*, No. 10-876-cv, 2011 U.S. App. LEXIS 4824, at *7 (2d Cir. Mar. 9, 2011) (unpublished) ("[A] court may bifurcate a trial for convenience, to avoid prejudice, or to expedite and economize.") (citations omitted)). Indeed, issues of liability and damages are often bifurcated. *See Schlant*, 2001 U.S. Dist. LEXIS 16539, at *2 (liability and damages phases bifurcated in trial of plaintiff's Title VII claims); *Dallal v. New York Times Co.*, 352 Fed. App'x 508, 512 (2d Cir. 2009) (unpublished) ("The district court was well within its discretion in bifurcating the liability and damages phases of the trial, a sensible means of achieving expedition and economy."); *see also U.S. v. City of New York*, No. 07-CV-2067 NGG, 2007 U.S. Dist. LEXIS 65668, at *6 (E.D.N.Y. Sept. 5, 2007) ("Plaintiff correctly notes that '[e]xperience has demonstrated the value of bifurcation in pattern or practice employment discrimination cases such as this.'").

Bifurcation of the trial as to the determination of the front and back pay awards will avoid prejudice and confusion and serve the interests of efficiency and convenience. First, the issues surrounding a possible award of damages to Plaintiff are not comparable to those issues surrounding Marriott's liability. Accordingly, the evidence and testimony to be utilized in

11

addressing the issue of damages will differ significantly from those to be utilized in addressing Marriott's liability. Much of the analysis into Plaintiff's back pay calculation will deal with events that occurred after his termination (*e.g.*, his employment at the Surrey Hotel and subsequent disability) bearing no relevance to the liability analysis. Presenting both issues to a jury will likely result in unnecessary juror confusion that can easily be avoided by bifurcating the proceedings.

Second, bifurcation will serve the interests of efficiency as evidence relating solely to economic damages will only be presented if there is a finding of liability. In doing so, bifurcation will effectively allow for shorter and more efficient proceedings if liability is not found, as the parties will not have to present evidence pertaining to such economic damages. Evidence supporting and opposing Plaintiff's disability is extensive. As stated above, substantial evidence (including hundreds of pages of Plaintiff's medical records which Defendants did not possess when the Pre-Trial Order was filed) about Plaintiff's post-Marriott injuries and permanent disability will be introduced to defend against Plaintiff's back pay and front pay demands—if Plaintiff is permitted to introduce evidence beyond March 10, 2017.  Because issues of back pay and front pay require testimony and exhibits on issues wholly separate from Defendants' alleged liability and are readily severable, preventing juror confusion and promoting judicial efficiency demand splitting the liability and damages determinations into separate phases. Courts often bifurcate trials into liability and relief phases for these very reasons. *Ravina v. Columbia Univ.*, No. 16-CV-2137 (RA), 2019 WL 1450449, at *2 (S.D.N.Y. Mar. 31, 2019) (action under Title VII and New York City Human Rights Law bifurcated into liability and damages phases); *Kauffman v. Maxim Healthcare Servs., Inc.*, 509 F. Supp. 2d 210, 213 (E.D.N.Y. 2007) (action under Title VII and New York State Human Rights Law bifurcated into liability and damages phases); *Leacock v.*

*Nassau Health Care Corp.*, No. 08CV02401JMAGRB, 2018 WL 4560731, at *1 (E.D.N.Y. May 25, 2018) (same).

Though Plaintiff cites *Todaro v. Siegel Fenchel & Peddy, P.C.*, 2008 WL 11446818 (E.D.N.Y. Aug. 11, 2008), that case is inapposite. In *Todaro*, the Court found defendants "point to no specific examples" that much of the liability evidence is irrelevant to damages (and vice versa). Conversely, Defendants provided specific examples in this regard, including those listed above and in prior briefings.

While federal New York courts have found that a plaintiff's entitlement to front pay is a legal remedy, courts retain the discretion to determine front pay to be made to a prevailing plaintiff under Title VII, the NYSHRL, and the NYCHRL. *See Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 95 (E.D.N.Y. 2020); *Becerril v. E. Bronx NAACP Child Dev. Ctr.*, No. 08CIV.10283 (PAC) KNF, 2009 WL 2611950, at *5 (S.D.N.Y. Aug. 18, 2009), report and recommendation adopted sub nom. *Becerril v. Ease Bronx NAACP Child Development Ctr.*, No. 08 CIV. 10283 PACKNF, 2009 WL 2972992 (S.D.N.Y. Sept. 17, 2009) (court awarding front pay where plaintiff brought claims under Title VII and the New York State Human Rights Law); *Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573 (S.D.N.Y. 2011) (noting jury awarded employee back and front pay award but that front pay was to be determined by court, where employee sued former employer alleging unlawful retaliation under Title VII, New York State Human Rights Law, and New York City Human Rights Laws).

Plaintiff contends bifurcation at trial to determine back pay, if any, is impractical. Defendants disagree. Yet the likelihood of a finding of wrongful termination warranting any back pay award is remote under the facts in the record.  The Court will recall Plaintiff and individual defendant Sekson Pongpanta were involved in a physical altercation on May 9, 2016 at the Hotel.

(Dkt. 149, p. 9, ¶ 23). Following the dispute, Marriott suspended both Plaintiff and Mr. Pongpanta pending further investigation into the incident. (*Id.* at ¶ 26). Upon further investigation into the incident, Marriott terminated the respective employments of both Plaintiff and Mr. Pongpanta on May 24, 2016. (*Id.* at ¶ 27). Under these facts, the parties should endeavor not to waste the jury's time with issues regarding back pay. *See, e.g., Kelly v. Metro-N. Commuter R.R.*, No. 87 CIV. 5817 (JFK), 1989 WL 156298, at *7 (S.D.N.Y. Dec. 18, 1989); *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, No. 11CV6201 DLC, 2014 WL 7234593, at *3 (S.D.N.Y. Dec. 18, 2014) (excluding minimally relevant evidence, in part, because it would add to the length of the trial and waste the jury's time); Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, *wasting time*, or needlessly presenting cumulative evidence.") (emphasis added).

## III.  PLAINTIFF'S MEDICAL RECORDS ARE INADMISSIBLE HEARSAY.

To be admitted at trial, evidence must be relevant, authenticated, and admissible under the Federal Rules of Evidence. *See, e.g., Fed. R. Evid*. 102, 401, 402, 901. Evidence may not be admitted at trial when it falls into the category of "hearsay," defined as "a statement that (1) the declarant did not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted." *Fed. R. Evid*. 801. As the U.S. Supreme Court explains, the rule against hearsay is

> grounded in the notion that untrustworthy evidence should not be presented to the triers of fact. Out-of-court statements are traditionally excluded because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury.

*Chambers v. Mississippi,* 410 U.S. 284, 298 (1973). In other words, hearsay evidence cannot be put before the jury because, by its very nature, the jury cannot evaluate whether the hearsay evidence is reliable.

Introducing evidence—both in general and especially when seeking to evade the rule against hearsay—requires laying a "foundation" for its admissibility. *Phoenix Associates III v. Stone,* 60 F.3d 95, 101 (2d Cir. 1995). In other words, the party seeking to introduce evidence normally barred by the rule against hearsay must prove by witness testimony (or, in certain cases, written certification) that the evidence meets the requirements of the particular hearsay exception or exceptions arguably at issue. *See, e.g., Raphaely Int'l, Inc. v. Waterman S.S. Corp.,* 972 F.2d 498, 502 (2d Cir. 1992) (discussing the foundation requirements of the business record exception to the rule against hearsay).

Though Plaintiff has not provided a copy of his proposed trial exhibits to the Court or defense counsel, proposed Trial Exhibits 16, 17, and 18 appear to be medical records which are plainly hearsay:

> ***16.*** *Medical Records to Emergency Department visits of Plaintiff at Saint Claire's Health System/Hospital in 2016 for chest pains and anxiety attacks.*

> ***17.*** *Medical Records from Dr. Raoul Rodriguez relating to ongoing treatment of Plaintiff for anxiety and depression.*

> **18.** *Mental Healthcare Treatment records of Plaintiff*

These records contain out-of-court statements made by Plaintiff to health care professionals, presumably intended to be introduced to prove the state of Plaintiff's medical condition.

The records meet no hearsay exceptions. Introducing apparent hearsay evidence under the medical records exception requires the party seeking introduction to "lay a foundation"—*i.e.*, to demonstrate that the records at issue are what they seem to be and that they satisfy the

requirements of the hearsay exception. *See, e.g., O'Gee v. Dobbs Houses, Inc.,* 570 F.2d 1084, 1089 (2d Cir. 1978); *Shea v. Royal Enterprises, Inc.,* No. 09 Civ. 8709 (THK), 2011 WL 2436709, at * 11 (unreported) (S.D.N.Y. June 16, 2011).

Here, Plaintiff cannot lay a foundation sufficient to satisfy the requirements of the medical records exception under Rule 803(4) or the business records exception under Rule 803(6) because no witness he intends to call can establish that the records are what they appear to be or that they conform to the requirements of either exception. As memorialized in the Pretrial Order (Dkt.# 149), Plaintiff identifies no proposed witnesses to provide testimony to confirm the records from "Saint Claire's Health System/Hospital" (Trial Exhibit 16) or the vaguely referenced "Mental Healthcare Treatment records of Plaintiff" (Trial Exhibit 18) are medical records containing statements made for medical diagnosis and treatment, or that the records are kept in the ordinary course of business. Nor has Plaintiff made any provision to obtain a certification to satisfy Rule 803(6)(D).

Moreover, even were Plaintiff prepared to provide such foundational testimony from Dr. Rodriguez concerning his medical records (Trial Exhibit 17), the fact remains that these records were not produced to Defendants at any time before Plaintiff filed the pretrial order on August 7, 2021. Indeed, Dr. Rodriguez was identified by name by Plaintiff only days before the pretrial order was filed.  In *Ginns v. Towle,* the Second Circuit confronted a medical expert who was permitted to testify at trial in support of a plaintiff in a personal injury case though the defendant objected that he had never received a copy of that expert's medical report. 361 F.2d 798, 800 (2d Cir. 1966). The plaintiff's counsel responded that a copy had been mailed to the defense counsel. *Id.* The trial judge "accepted both statements and concluded that the report went astray, for some unknown reason." *Id.* The Second Circuit rejected this conclusion and held "the basic

purpose of the federal rules, particularly those concerning discovery and disclosure, is to eliminate trial by ambush, sometimes called the sporting theory of justice, and avoid the very kind of surprise practiced upon the defense in this case." *Id.* at 801.  *Accord Djangmah v. Falcione*, No. 08 CIV. 4027 KPF, 2013 WL 6388364, at *4–7 (S.D.N.Y. Dec. 5, 2013) (unreported) (same).  Because the proposed medical records are hearsay and fall outside any exception, Trial Exhibits 16, 17 and 18 should be excluded.

## IV.   THE COURT SHOULD EXCLUDE EVIDENCE AND TESTIMONY REFERRING TO THE COMPARATIVE SIZE AND WEALTH OF THE PARTIES.

The Court should preclude Plaintiff from referring to or offering any testimony, remark, statement or inference to Defendant Marriott's current financial position, or wealth, or comparing the wealth or size of Marriott to that of Plaintiff, including any comments or references that characterize this case as one involving an individual against a large corporation (*i.e.*, "a battle between David and Goliath"), and/or referring to Marriott's ability to pay a judgment or afford counsel.

The U.S. Supreme Court has stated that "the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003) (quoting *Honda Motor Co. v. Oberg*, 512 U.S. 415 (1994)); *see also TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 464 (1993) (noting that "[t]he emphasis on the wealth of the wrongdoer increased the risk that the award may have been influenced by prejudice against large corporations"); *Curtis Mfg. Co. v. Plasti-Clip Corp.*, 933 F. Supp. 94, 101 (D.N.H. 1995) (holding that evidence of defendant's current financial condition or wealth is inadmissible under FED. R. EVID. 401, 402 and 403).

As he stated during his deposition, Plaintiff is expected to argue and present testimony and evidence to the jury that Marriott is a large corporation in comparison to Plaintiff, an individual, in an attempt to paint Marriott unfavorably or as a bully. But the size and wealth of Marriott has nothing to do with the issues that will be put before the jury.

Courts routinely preclude such characterizations and evidence as having no relation to the claims or defenses at issue under FED. R. EVID. 401 and being highly prejudicial and likely to mislead a jury under FED. R. EVID. 403. *Prisua Eng'g*, 2018 U.S. Dist. LEXIS 221548, at *10 ("The Court finds that evidence of Samsung's or its affiliates' net worth, total revenues, and total profits is irrelevant and likely to mislead the jury."); *see also Biscotti Inc. v. Microsoft Corp.*, No. 13-cv-01015-JRG-RSP, 2017 U.S. Dist. LEXIS 94040, at *4-5 (E.D. Tex. May 30, 2017) (precluding references "to Microsoft's overall size, net worth, market capitalization, or stock value"); *Eidos*, 2017 U.S. Dist. LEXIS 157062, at *7 (precluding testimony about total revenue or sales); *Bausch & Lomb*, 2016 U.S. Dist. LEXIS 88477, at *4 ("Neither party shall refer to the financial resources of a party, including references to the costs of litigation, without prior approval of the Court."); *Ill. Tool Works, Inc. v. MOC Prods. Co.*, 946 F. Supp. 2d 1042, 1048 (S.D. Cal. 2012) (precluding references to Plaintiff's size); *Util. Trailer Sales of Kan. City, Inc. v. MAC Trailer Mfg., Inc.*, No. 09-cv-2023-JPO, 2010 U.S. Dist. LEXIS 48089, at *13 (D. Kan. May 14, 2010) (excluding "David and Goliath evidence"); *Borders v. Arch Aluminum & Glass Co.*, No. 07-12-cv-2188-JPO, 2008 U.S. Dist. LEXIS 105360, at *6 (D. Kan. Dec. 30, 2008) ("Applying the standard of relevance set out in FED. R. EVID. 401, the court finds the so-called 'David and Goliath' evidence is irrelevant to the claims in this case."); *Rogers v. Medline Indus., Inc.,* No. 1:17CV118-HSO-RHW, 2019 WL 402361, at *4 (S.D. Miss. Jan. 31, 2019) (granting defendant's motion to exclude references suggesting plaintiff faces a "David and Goliath" situation.); *Combs v. Cordish*

*Companies, Inc.*, No. 14-0227-CV-W-ODS, 2018 WL 1464033, at *9 (W.D. Mo. Mar. 23, 2018) (granting defendant's motion to preclude the parties from making comments, referencing, or seeking to admit evidence characterizing the case as pitting an individual against a large corporation).  Accordingly, the Court should preclude any reference to the size and/or wealth of Marriott in this case.

**V.     THE COURT SHOULD EXCLUDE EVIDENCE AND TESTIMONY REFERRING TO PLAINTIFF AS A "VICTIM" OR "VICTIMIZED."**

The term "victim" incorrectly implies the existence of a criminal legal proceeding and serves only to inflame the jurors and to improperly permit bias, sympathy, or prejudice to play a part in their deliberations.  Using Plaintiff's name or the term "Plaintiff" are alternative options that do not involve this same problematic implication.

**VI.    THE COURT SHOULD EXCLUDE EVIDENCE AND TESTIMONY CONCERNING THE EXISTENCE OF ANY MEDICAL OPINIONS, DIAGNOSES, DISCUSSIONS OF TREATMENT OR OPINIONS AS TO CAUSATION OFFERED BY PLAINTIFF, NON-MEDICAL OPINION WITNESSES, AND/OR LAYPERSONS.**

Neither Plaintiff nor any lay witness may opine regarding medical diagnoses, medical causation, medical tests and procedures, or other technical matters.  *Fane v. Zimmer, Inc.*, 927 F.2d 124, 131 (2nd Cir. 1991).  Testimony by non-medical witnesses and laypersons concerning medical conditions would only be based upon speculation, conjecture and lack of expertise and are not permitted under FED. R. EVID. 701, 702 and 703.  Neither the Plaintiff, nor any lay witnesses are medically trained and, therefore, they are incompetent to render opinion testimony on medical issues.  Consequently, medical opinion testimony by the Plaintiff or any of the Plaintiff's lay witnesses on, for example, Plaintiff's diagnosis of "depression" would not be competent or relevant to any issues in the case and would only serve to prejudice the Defendants.  Such matters

are outside the scope of knowledge of lay persons and require the testimony of an expert under

Rules 701, 702, and 703 of the FEDERAL RULES of EVIDENCE.

## VII.   THE COURT SHOULD EXCLUDE EVIDENCE AND TESTIMONY REGARDING WHAT HEALTH CARE PROVIDERS HAVE TOLD PLAINTIFF.

Under Rule 801(c) of the FEDERAL RULES of EVIDENCE, a statement is inadmissible hearsay

if (1) the declarant does not make the statement while testifying at the current trial or hearing; and

(2) a party offers it in evidence to prove the truth of the matter asserted in the statement.  FED. R.

EVID. 801(c).  Here, Plaintiff cannot testify as to what his doctor told him because it would be

inadmissible hearsay.  *See Ashbaugh v. Windsor Capital Grp., Inc.*, No. 10 CIV. 4647 ILG LB,

2012 WL 2319240, at *5 (E.D.N.Y. June 19, 2012) (Plaintiff's treating doctor's statements to

her—whatever they were—are inadmissible hearsay); *Sussman v. New York City Health & Hosps.*

*Corp.,* 47 F. App'x 19, 22 (2d Cir. 2002) (finding the district court properly excluded plaintiff's

hearsay testimony as to what his doctors had told him).[2]  Accordingly, any testimony by Plaintiff

concerning what a health care provider told him is inadmissible as hearsay.

## VIII.   THE COURT SHOULD EXCLUDE MENTION OF DEFENDANTS' DECISION NOT TO CALL AN AVAILABLE WITNESS.

The Court should exclude any testimony, remark, statement, or inference that Defendants

may not have called to testify any witness equally available to Plaintiff as such reference would

be irrelevant, improper, and prejudicial to Defendants.  FED. R. EVID. 403.

---

[2] Though Plaintiff cites *Walker v. Kubicz,* 996 F. Supp. 336 (S.D.N.Y. 1998) for the proposition that Plaintiff's testimony would be offered to show the effect that healthcare providers' statements had on Plaintiff's understanding of his conditions and demonstrate the basis for his reactions and fears, this is not what *Walker* holds. In *Walker*, the physician's opinion, cited in a prison physician's sworn declaration was inadmissible hearsay. However, it was admissible for the limited purpose of "demonstrating *the physician's mental state*"—not for demonstrating the plaintiff's mental state or impressions. The other case Plaintiff cites, *Ferrara v. Galluchio,* 5 N.Y.2d 16, 20 (1958), is 65 years old and has been abrogated.

IX. **EXCLUDE EVIDENCE AND TESTIMONY REGARDING PLAINTIFF'S CHARGES OF DISCRIMINATION FILED WITH THE NEW YORK DIVISION OF HUMAN RIGHTS AND/OR UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION.**

The contents of Plaintiff's Charges of Discrimination to the NYDHR or EEOC; their decisions or Right-to-Sue letter; and any evidence relating to the NYDHR's or EEOC's investigation and proceedings are irrelevant and otherwise unduly prejudicial. The contents of the Charges of Discrimination are also likely to mislead the jury, cause undue delay, and waste time.

Determinations and investigative files may be admitted as evidence in a trial. *Paolitto v. John Brown E. & C., Inc.,* 151 F.3d 60, 65 (2nd Cir. 1998). However, the Second Circuit has made clear that neither Determinations nor investigative files must be admitted categorically. Indeed, in *Paolitto,* the Court of Appeals upheld the district court's exclusion of both the agency determination and the investigative file. *Id.* at 65-66. In assessing the admissibility of an agency determination and the investigative file, the trial court should consider the "quality of the evidence, its potential impact on the jury, and the likelihood that the trial will deteriorate into a protracted and unproductive struggle over how the evidence at trial compared to the evidence at the agency." *Lovejoy- Wilson v. Noco Motor Fuels, Inc.,* 242 F. Supp.2d 236, 242 (W.D. N.Y. 2003). It is for the trial court to determine whether admission of the EEOC file is proper based on the overall circumstances at trial. *Parrish v. Sollecito,* 280 F. Supp.2d 145, 166-167 (S.D. N.Y. 2003) (affirming the exclusion of an affidavit submitted to the EEOC).

In this case, if Plaintiff is permitted to admit his numerous Charges of Discrimination and Determination Letters, the trial on Plaintiff's claims will devolve into mini-trials about the contents of same, which will mislead the jury in violation of FED. R. EVID. 403. Given the other legitimate disputes in this case, this will be a waste of time for the Court and jury and be unduly prejudicial to Defendants.

The Second Circuit warns that admitting such evidence, including an EEOC Determination, would necessarily force the opposing party "to attempt to expose the weaknesses of the report - an effort that may well confuse or mislead the jury and result in an undue waste of time." *Parrish v. Sollecito,* 280 F. Supp. 2d 145, 166 (S.D.N.Y. 2005) (quoting *Paolitto*, 151 F.3d at 65); *see also Lovejoy-Wilson v. Noco Motor Fuels, Inc.*, 242 F. Supp. 2d 236, 242 (W.D.N.Y. 2003) (same). Clearly, Defendants would be prejudiced by having to address and rebut in the presence of the jury all the material misstatements in and omissions from the Charges and Determination. As such, any evidence of NYDHR or EEOC's investigation and proceedings are irrelevant and otherwise unduly prejudicial and should be excluded.

## X.  THE COURT SHOULD EXCLUDE EVIDENCE AND TESTIMONY REGARDING THE ALLEGED DISCRIMINATORY REMARKS MADE BY NON-DECISIONMAKERS.

Stray remarks by co-workers, without more, are generally not enough to support a finding of discrimination. *Argueta v. N. Shore Long Island Jewish Health Sys, Inc.,* 2003 U.S. Dist. Lexis 20456 (E.D.N.Y 2003), citing *Woroski v. Nashua Corp.*, 31 F.3d 105, 109-10 (2nd Cir. 1994); *see also Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) (citing *Woroski* for the proposition that "stray remarks, even if made by a decisionmaker, do not constitute sufficient evidence to make out a case of employment discrimination"). Specifically, "stray remarks in the workplace," "statements by nondecisionmakers," and "statements by decisionmakers unrelated to the decisional process" are not by themselves sufficient to satisfy plaintiff's burden of proving pretext or to establish discriminatory intent. *Burrell v. Bentsen,* No. 91 Civ. 2654; 1993 U.S. Dist. LEXIS 18005 at 29-30 (S.D.N.Y. 1993) (quoting *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 448 (8th Cir. 1993) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 278, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989) (O'Connor, J., concurring))), aff'd, 50 F.3d 3 (2nd Cir. 1995). Stray remarks

are not evidence of discrimination "if they are not temporally linked to an adverse employment action or if they are made by individuals without decision-making authority." *Sergilus v. Covenant House Under 21,* No. 96 Civ. 6210, 1999 U.S. Dist. LEXIS 14254, at 6 (S.D.N.Y. Sept. 15, 1999) (citing *Price Waterhouse,* 490 U.S. at 278 (O'Connor, J., concurring); *Campbell v. Daytop Vill.,* Inc., No. 97 Civ. 4362, 1999 U.S. Dist. LEXIS 6943, at 3 (S.D.N.Y. May 7, 1999); *Orisek v. Am. Inst. of Aeronautics & Astronautics,* 938 F. Supp. 185, 192 (S.D.N.Y. 1996)).

It is undisputed that Defendants Efstratiou, Pongpanta and Tehrani had no decision-making authority at Marriott.  Efstratiou, Pongpanta and Tehrani were employed in the same capacity as Plaintiff – banquet servers.  There is no evidence that these Defendants had any supervisory authority over Plaintiff, let alone any involvement in the decision to terminate Plaintiff.  Without the authority to "effect a tangible change in Plaintiff's terms or conditions of employment," the Defendants cannot be "supervisors" under the law.  *See*, *e.g.*, *Charley v. Total Office Planning Servs.*, 202 F.Supp.3d 424, 431 (S.D.N.Y. 2016) (individual who gave the plaintiff "daily work assignments," "submitted her hours to the Union," and to whom the plaintiff was directed to if there was a problem or if she needed direction was not the plaintiff's supervisor); *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2448 (2013).

Here, the record fails to demonstrate that a nexus exists between the alleged discriminatory comments made by Defendants Efstratiou, Pongpanta and Tehrani and the decision to discharge Plaintiff.  This connection is necessary to establish discriminatory intent.  (*See Schreiber v. Worldco, LLC,* 324 F. Supp. 2d 512, 518 (S.D.N.Y 2004); *Opoku-Acheampong v. Depository Trust Co.,* 2005 U.S. Dist. LEXIS 16387 (S.D.N.Y. 2005); and *Argueta,* 2003 U.S. Dist. Lexis 20456, 26 (E.D.N.Y. 2003)).  Absent the nexus, Plaintiff cannot claim that the statements created a "discriminatory environment."  *Id.* at 28.

Even if the Court determines that the evidence regarding Defendants Efstratiou, Pongpanta and Tehrani alleged comments is relevant, it should be precluded from trial as the probative value of the alleged comments is far outweighed by the danger of unfair prejudice to the Defendants. The jury may infer that the alleged comments were made by people with decision-making authority or that the alleged comments influenced the decision-maker.  Such inference would be highly prejudicial to the Defendants.

With regards to Defendant Doherty, she too did not have decision-making authority over Plaintiff.  At all pertinent time periods, Doherty was employed as Human Resource Director for Marriott.

To establish individual liability, Plaintiff must show an "affirmative link to causally connect the actor with the discriminatory action."  *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 229 (2nd Cir. 2004) (quotations omitted).  Here, Plaintiff repeatedly references two alleged comments he attributes to Defendant Doherty (which she denies).  No reasonable person could view the first alleged comment (referencing the purported volume of paperwork Plaintiff's wage theft complaints allegedly generated) as connected to Plaintiff's national origin, color, race, or religion. As a matter of law, that comment is not evidence supporting his claims.  *Blue v. Macy's Herald Square*, 2013 U.S. Dist. LEXIS 99265, at *10 n.5 (S.D.N.Y. July 16, 2013) (dismissing a Title VII claim because "Blue states he 'was chastised for *contacting Security' about his suspicions that his co-workers were stealing*.  Such conduct, however, is not protected by Title VII, because Blue's allegation of theft against his co-workers did not involve discrimination on the basis of race or gender" (emphasis added)); *see also Berlyavsky v. N.Y.C. Dep't of Envtl. Prot.*, 2015 U.S. Dist. LEXIS 133647, at *34 (E.D.N.Y. Aug. 28, 2015) ("[T]he discrimination statutes on which Plaintiff relies [Title VII and NYSHRL] do not protect *whistleblower activities*."  (emphasis added)).

Likewise, the second comment Plaintiff attributes to Defendant Doherty (that she allegedly threatened to terminate his employment) is neither an adverse employment action nor evidence of discrimination—especially because Doherty (like the banquet server Defendants) lacked the authority to terminate anyone's employment. *See Bowles v. N.Y. City Trans. Auth.*, 2006 U.S. Dist. LEXIS 32914, at *34 (S.D.N.Y. May 23, 2006) ("[A]n unrealized threat of discipline or termination is not actionable under Title VII."). "[R]eprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation." *Honey v. Cnty. of Rockland*, 200 F.Supp.2d 311, 320 (S.D.N.Y. 2002) (citing *Carter v. N.Y. City Dep't of Corrs.*, 7 Fed. Appx. 99, 103 (2nd Cir. Apr. 5, 2001)); *see also Bennett v. Watson Wyatt & Co.*, 136 F.Supp.2d 236, 248 (S.D.N.Y. 2001) (where the plaintiff was repeatedly warned but never disciplined, "such criticism, without any other negative results such as a decrease in pay or being placed on probation, simply cannot support plaintiff's discrimination claims."). This is true even if the allegations of wrongdoing, on which the threats of disciplinary action are based, are false. *Henry v. N.Y. City Health & Hosp. Corp.*, 18 F.Supp.3d 396, 407 (S.D.N.Y. 2014) ("alleged manufacturing of charges against [the plaintiff]" did not constitute adverse employment action).

Likewise, Defendant Doherty's alleged comments did not "chill" Plaintiff's alleged protected activity because he continued to raise his (unfounded and uncorroborated) allegations of wage theft and name-calling against his co-workers in 2013, 2014, and 2016. *See Jaquez v. N.Y. City Health & Hosps. Corp.*, 2016 U.S. Dist. LEXIS 3897, at *40 (S.D.N.Y. Jan. 11, 2016) (to prove retaliation under NYCHRL, the plaintiff must prove the alleged retaliatory actions were "reasonably likely to deter a person from engaging in protected activity").

At best, Plaintiff offers one stray remark purportedly made by a non-decision maker that cannot justify individual liability as a matter of law.  *See McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 79 (2nd Cir. 2010); *Dickens v. Hudson Sheraton Corp.*, LLC, 167 F.Supp.3d 499, 517 n.12 (S.D.N.Y. 2016).  Any evidence of stray remarks allegedly made by the Defendants, all of whom are non-decision-makers, is irrelevant and otherwise unduly prejudicial and should be excluded.

## XI.    THE COURT SHOULD EXCLUDE EVIDENCE AND TESTIMONY REGARDING INFLAMMATORY RACIAL SLURS NOT REPORTED TO MANAGEMENT BY PLAINTIFF.

Defendants have reason to believe Plaintiff and potential witness Lubos Naprstek ("Naprstek"), a former co-worker of Plaintiff's, may testify that they heard an unknown "banquet cook" refer to the Plaintiff by the "n" word at some unknown time. This proposed statement—which was never reported to Marriott during Plaintiff's employment—should be excluded by the Court as hearsay. *See* FRE 801.

Furthermore, any such evidence or testimony of racial slurs or epithets should be barred as inflammatory (including the "n" word, which is perhaps the single-most inflammatory word known) and unduly prejudicial. *See* FRE 403. Unfair prejudice is an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Old Chief v. United States,* 519 U.S. 172, 180, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997) (*quoting* Fed.R.Evid. 403 Advisory Comm. Notes). Evidence with the capacity to "arouse[ ] jurors' sense of horror" or "provoke[ ] a jury's instinct to punish" is unfairly prejudicial. 2 J. Weinstein, M. Berger, & J. McLaughlin, *Weinstein's Federal Evidence* § 403.04 [1]. Clearly, racial slurs such as the "n" word are highly and deeply inflammatory. *See, e.g., Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001) (noting the "N" word is "perhaps the most offensive and inflammatory racial slur in English a word expressive of racial hatred and bigotry"); *Bradshaw v. Swagerty*, 1 Kan. App. 2d

213, 215 (Kan. Ct. App. 1977) (The "N" word "is one of insult, abuse and belittlement harking back to slavery days."). For those reasons, courts will bar such evidence when not necessary to the case. *See, e.g., Green v. New Jersey Mfrs. Ins. Co.*, 160 N.J. 480, 501-02 (1999) (evidence of racial bigotry will almost always be so unduly prejudicial as to effectively "drown out" all factors favoring its admissibility); *State v. Rose*, 112 N.J. 454, 489 (1988) (defendant's statement that he purchased a shotgun because he was "having trouble with some niggers in New Jersey" should have been excluded because its limited relevance was substantially outweighed by its prejudicial nature).  As such, the statement, in addition to being hearsay, should be excluded as highly inflammatory, and any other references to racial slurs should also be excluded on the grounds that they are unduly prejudicial.

## XII.   RICHARD SWARTZ SHOULD BE PRECLUDED FROM TESTIFYING AT TRIAL.

Pursuant to FRCP Rule 26(a)(3), Plaintiff was required to disclose all witnesses at least 30 days prior to trial. Further, Rule 26(a)(1) requires disclosure of fact witnesses in a timely fashion so the opposing party may take the discovery of that witness. *See Irish v. Tropical Emerald LLC*, No. 18-CV-82-PKC-SJB, 2021 WL 1827115, at *3 (E.D.N.Y. May 6, 2021)

However, on March 3, 2023, only 17 days prior to the March 20, 2023 trial date, Plaintiff sent an email to Defendants' counsel in which a new witness was disclosed—Richard Swartz. Mr. Swartz was Plaintiff's attorney between 2013 and 2015, and is expected to testify that he wrote and sent three letters to Karen Doherty. However, the Court should preclude this witness from testifying at trial, as the disclosure by Plaintiff's counsel was untimely and runs afoul of Rule 26.

Rule 26(a) "fulfills a critical function: transmitting formal notice from the disclosing party to the opposing party that the opposing party should be prepared for the disclosing party to use the

27

information provided by the witness. In the absence of such a disclosure, the opposing party can properly assume that its adversary will not rely upon that witness." *Lebada v. N.Y.C. Dep't of Educ.*, No. 14-CV-758, 2016 WL 626059, at *5 (S.D.N.Y. Feb. 8, 2016), *report and recommendation adopted*, 2016 WL 8453417 (May 16, 2016). Disclosing a new witness at the end or after the discovery period "gives little to no time to notice a deposition or to obtain documents from the witness in a reasonable manner… The kind of late disclosure by Defendants in this case undermines this objective." *Irish v. Tropical Emerald LLC, supra,* at *3. Furthermore, "A party is not excused from making its disclosures because it has not fully investigated the case[.]" *Id. See, e.g.*, *Lincoln Rock, LLC v. City of Tampa*, No. 15-CV-1374, 2016 WL 6138653, at *11 (M.D. Fla. Oct. 21, 2016) (striking supplemental Rule 26 disclosure made two weeks before close of discovery). As such, the Court should preclude Richard Swartz from appearing as a witness and testifying at trial, due to Plaintiff's untimely disclosure.

## XIII. THE COURT SHOULD EXCLUDE EVIDENCE AND TESTIMONY REGARDING THE SECRET AUDIO RECORDING THAT PLAINTIFF MADE OF HIS SUSPENSION DISCUSSION, INCLUDING ANY TRANSCRIPT OF SAME.

In as much as the surreptitious audio recording (and any transcript) cannot be authenticated, they are not the best evidence of the alleged conversation that occurred between Plaintiff and Marriott managers in May 2016.  The conversation also is hearsay and should be excluded by the Court.

"To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed R. Evid. 901(a). "'Because tape recordings are likely to have a strong effect on the jury and are susceptible to alteration, the Second Circuit requires their authenticity to be

established by clear and convincing evidence.'" *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Sup. 2d 251, 263 (S.D.N.Y. 2003) (citation omitted).

"In assessing whether a proffered sound recording is authentic, the Court is to consider a number of factors, including the following: (1) that the recording device used was capable of taping the conversation now offered in evidence; (2) that the operator of the device was competent to operate it; (3) that the recording is authentic and correct; (4) that changes, additions, or deletions have not been made to the recording; (5) that the recording has been preserved in the manner that is presented to court; (6) that the speakers are identified, and (7) that the conversation elicited was made voluntarily and in good faith." 262 F. Sup. 2d at 264. To authenticate the recording, Plaintiff must not only demonstrate the identity of the individuals whose voices are depicted in the recording, but also that the recording is authentic, that the conversations are accurately depicted, and the recording has not been altered. *See id*. Plaintiff cannot show that the surreptitious recording he made satisfies the above factors.

Moreover, neither the audio recording nor the transcript of same is the best evidence of these purported conversations. Pursuant to Rule 1002 of the Federal Rules of Evidence, "[a]n original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise." Fed. R. Evid. 1002. Here, Plaintiff has never identified in more than five years how the audio was recorded, on what device the recording was made, or whether the original still exists.

Plaintiff should also be precluded from introducing the transcript of the audio recording to prove the content of the conversations that happened on the day he was suspended from his employment in May 2016. Only the original recording of this conversations can be admitted and relied upon for such purposes. *See* Fed. R. Evid. 1002.

Because there are concerns about the completeness, accuracy and reliability of the audio recording and transcript, and neither are the best evidence of the conversations that took place in May 2016, they are inadmissible. *See* Fed R. Evid. 901(a); Fed. R. Evid. 1002; *Perkins*, 2005 U.S. Dist. LEXIS 22541, *44.

Additionally, the audio recording and transcript are inadmissible as hearsay, as they contain statements made out of court that are being proffered as evidence to prove the truth thereof. *See* Fed R. Evid. 801. Thus, the Court should exclude them from being offered as evidence at trial.

### XIV.   THE COURT SHOULD EXCLUDE PLAINTIFF'S UNTIMELY DISCLOSURE OF AN AUGUST 11-13, 2013 EMAIL CHAIN.

Despite active discovery closing more than five years ago, Plaintiff recently produced an email chain from August 11 to August 13, 2013 between Lubos Naprstek and Stamatis Efstratiou. Plaintiff produced this email with Defendants for the first time on February 11, 2023, years after the close of discovery, and thereafter Plaintiff's counsel notified Defendants of Plaintiff's intention to use the email chain as an exhibit at trial. This late disclosure also runs afoul of Rule 26, and, as such, the Court should exclude this email from the evidence at trial.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request the Court grant their *in limine* Motions.

FORD HARRISON LLP

*Counsel for Defendants*

By: <u>*/s/ Mark A. Saloman*</u>
        Mark A. Saloman
        300 Connell Drive, Suite 4100
        Berkeley Heights, New Jersey 07922
        msaloman@fordharrison.com
        973.646.7305
        *Attorneys for Defendants*

Dated: March 20, 2023