UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GEBRIAL RASMY,

Plaintiff,

-against-

MARRIOTT INTERNATIONAL, INC. ET AL.,

Defendants.

16-cv-4865 (JSR)

MEMORANDUM ORDER

JED S. RAKOFF, U.S.D.J.:

In June 2016, plaintiff Gebrial Rasmy, who was born and raised in Egypt, filed suit against his former employer Marriott International, Inc. ("Marriott"), his former supervisor Estratue Stamatis, his former human resources manager Karen Doherty, and Marriott employees Sesskon Pongpanta and Tehrani Mehrani, alleging that he was discriminated against based on his race, religion, and national origin in violation of Title VII of the Civil Rights Act of 1964, 18 U.S.C. § 1981, New York State Executive Law, and the New York City Administrative Code. Over the next eight years, Rasmy retained thirteen different attorneys from twelve different law firms to represent him. Ultimately, after the case was reassigned for trial to the undersigned, the case went to trial and, even though the jury found all but one of the defendants not liable, it awarded Mr. Rasmy $400,000 against Mr. Stamatis on a single charge of retaliation. Now, however, one of Mr. Rasmy's former attorneys Michael Diederich has moved for a charging lean on Rasmy's trial award. For the reasons stated below, the motion is granted.

## I. Factual Background

Mr. Diederich represented Mr. Rasmy from February 2022 to October 2022, after five previous sets of attorneys either were fired by Mr. Rasmy or withdrew from his case. During that time, Mr. Diederich addressed various discovery issues, defended Mr. Rasmy at a supplemental deposition, prepared a subpoena, handled a motion in limine, and helped with trial preparation.

On October 3, 2022, Marriott offered Mr. Rasmy $250,000 to settle his claims. Mr. Diederich strongly recommended that Mr. Rasmy accept the offer. In an email dated October 7, 2022, Mr. Diederich stated that Mr. Rasmy's arrest in connection with a domestic violence incident would hurt his case if it went to trial. Specifically, Mr. Diederich stated:

> [I]t is my professional opinion that you will have essentially no chance to win a jury trial. . . . [I]n my opinion opposing counsel will destroy you with your own written words in cross-examination. . . . Opposing counsel might . . . ask you "Isn't it true, Mr. Rasmy, that every time you assault someone you then blame the victim? As an example, Mr. Rasmy, is it not true that when you viciously beat your wife in September 2014 that you immediately went to the police to report her as the aggressor, but then YOU were arrested for domestic violence?" The opposing counsel may continue: "How many of your Marriott co-workers knew of your arrest for domestic violence in 2014? Is that why so many of them were afraid of you?"

ECF No. 320, Ex. No. 3 ("Rasmy Declaration") at 3-4. In that same email, Mr. Diederich also indicated that Mr. Rasmy had only one witness, who had failed to respond to Mr. Diederich's calls and emails on Mr. Rasmy's behalf. By contrast, "Marriott has many documents and many witnesses who will say (or likely say) that you . . . were the

problem in the workplace." Id. at 4. Mr. Diederich also explained that refusing to settle would most likely result in substantial legal fees. See id. at 5. In closing, Mr. Diederich stated: "Please confirm that you have closely read the above, and understand the consequences of what you will be doing to yourself and your family if you refuse to settle." Id. at 5-6.

Within the hour, Mr. Rasmy's wife responded to Mr. Diederich's email, instructing him to "please do [his] job all the way." Id. at 2. A few minutes later, Mr. Diederich responded to Mr. Rasmy's wife, asking her to "[t]ake [her] time and read [his] email carefully, please" and stating: "I just hope for your husband's sake that you and he carefully consider my detailed email. I am doing my job by trying to convince your husband to settle a case he cannot reasonably win, when $250,000 is on the table." Id. at 1. Shortly thereafter, Mr. Rasmy responded by firing Mr. Diederich and stating that Mr. Diederich had "sabotaged [his] case purposely," had "tampered with [his] file," had failed to "file [his] documents properly to the court," and was a "fraud" who had "no shame" Id.

On October 10, 2022, one week before Mr. Rasmy's trial was set to begin, Rasmy sent a letter to the Court indicating that he had discharged Diederich. At a hearing on the letter, the Court allowed Mr. Rasmy to proceed with new counsel. During that hearing, Mr. Diederich stated that he was "happy to give [new counsel] insight on [his] work product, everything they need to get ready for trial, and then make a recommendation to Mr. Rasmy as to the merits of his case."

ECF No. 262 ("Hearing Transcript") at 8:3-5. Mr. Diederich then provided new counsel with a "roadmap regarding the strengths and weaknesses of [the] case," as well as proposed jury instructions. ECF No. 317 ("Diederich Declaration") at ¶ 33. The case subsequently went to trial. Although, as indicated, the jury found most defendants (including Marriott) not liable, it did award Mr. Rasmy $400,000 on his retaliation claim against Stamatis.

To date, apart from a $4,000 retainer fee, Mr. Rasmy has not paid Mr. Diederich for his services in this case. Mr. Diederich's retainer agreement provides that his fee shall be the greater of one third of "any sums recovered, whether recovered by suit, settlement or otherwise" or Mr. Diederich's "accrued fees." ECF No. 317, Ex. 1 ("Retainer Agreement") at 2. In this case, the sums are similar. One third of Mr. Rasmy's trial award is approximately $133,333. And, according to Mr. Diederich's detailed billing records, Mr. Diederich incurred $122,185 of expenses for his work on the case. See ECF No. 317, Ex. 2 ("Itemization of Time") at 11. Although Mr. Diederich is therefore arguably entitled to $133,333 or at least $122,185, he has moved under New York Judiciary Law § 475 for a charging lien of just $100,000 of Mr. Rasmy's $400,000 trial award.

**II. Jurisdiction**

Charging leans are governed by state law. However, federal courts have discretion to exercise ancillary jurisdiction over fee disputes that relate to the main cause of action over which they have

jurisdiction.[1] See Levitt v. Brooks, 669 F.3d 100, 103 (2d Cir. 2012). In determining whether it is appropriate to exercise ancillary jurisdiction over such disputes, federal courts consider various factors, including: (1) their "familiarity with the subject matter of the suit, especially the amount and quality of work performed by the attorneys," (2) their "responsibility to protect officers of the court in such matters as fee disputes," (3) "the convenience of the parties," and (4) "judicial economy." Id. at 104 (citing Cluett, Peabody & Co., Inc. v. CPC Acquistion Co., 863 F.2d 251, 256 (2d Cir. 1988)).

All four factors weigh in favor of exercising ancillary jurisdiction here. Having presided over the case and held a hearing concerning Mr. Rasmy's decision to relieve Mr. Diederich, the Court is well-familiar with the subject matter of the suit and Mr. Diederich's work throughout much of the proceedings. Both the convenience of the parties and judicial economy therefore favor exercising ancillary jurisdiction. In addition, the parties' fee dispute implicates the Court's responsibility to protect its officers. Accordingly, the Court concludes that it is appropriate to exercise ancillary jurisdiction in this case.

---

[1] This Court has federal question jurisdiction over Mr. Rasmy's Title VII and § 1981 claims and supplemental jurisdiction over his claims arising under New York State Executive Law and the New York City Administrative Code.

**III. The Charging Lien**

Under New York law, a lawyer who is discharged may exercise a lien over a former client's cause of action, award, or settlement. Specifically, New York Judiciary Law § 475 provides:

> From the commencement of an action, special or other proceeding in any court or before any state, municipal or federal government, . . . or the provision of services in a settlement negotiation at any stage of the dispute, the attorney who appears for a party has a lien upon his or her client's . . . award, settlement, judgment or final order in his or her client's favor. . . . The court upon petition of the client or attorney may determine and enforce the lien.

N.Y. Jud. Law § 475. Under that provision, if any attorney is discharged without cause, that attorney may recover "either (1) in quantum meruit, the fair and reasonable value of the services rendered, or (2) a contingent portion of the former client's ultimate recovery, but only if both of the parties have so agreed." Universal Acupuncture Pain Servs., P.C. v. Quadrino & Schwartz, P.C., 370 F.3d 259, 263 (2d Cir. 2004). However, if a client discharges an attorney for cause, then the Court will not enforce the attorney's charging lien. See Garcia v. Teitler, 443 F.3d 202, 211 (2d Cir. 2006).

"Poor client relations, differences of opinion, or personality conflicts do not amount to cause, which is shown by impropriety or misconduct on the part of the attorney." Id. at 212. "Attorney-client relationships frequently end because of personality conflicts, misunderstandings or differences of opinion having nothing to do with any impropriety by either the client or the lawyer." Klein v. Eubank, 663 N.E.2d 599, 601 (N.Y. 1996). "Others end because of unexpected

conflicts of interests or changes in litigation strategy that require different lawyering skills." Id. "[W]here an attorney's representation terminates and there has been no misconduct, no discharge for just cause and no unjustified abandonment by the attorney, the attorney's right to enforce the statutory charging lien is preserved without the need to resort to further negotiations or enter into new stipulations with the client." Id.

The Court concludes that Mr. Rasmy discharged Mr. Diederich without cause. As the October 7 email exchange suggests, Mr. Diederich's firing stemmed from "differences of opinion" on both the strength of Mr. Rasmy's case and Marriott's proposed settlement offer, as well as "personality differences" between Mr. Diederich and Mr. Rasmy. Garcia, 443 F.3d at 212. In addition, on the Court's review of the entire record, Mr. Diederich did not engage in any misconduct or abandon Mr. Rasmy during these proceedings. Indeed, Mr. Diederich did not "sabotage [Mr. Rasmy's] case purposely," "tamper[] with [Mr. Rasmy's] file," or fail to "file [Mr. Rasmy's] documents properly to the court."[2] Rasmy Declaration at 1. Mr. Diederich is therefore

[2] Mr. Rasmy also suggests that Mr. Diederich "demoralized and discouraged" his key witness by telling him that his testimony would hurt his own case against Marriot and asking him to tell Mr. Rasmy to "get his head out of the fucking sand." See ECF No. 321 ("Memorandum in Opposition") at 7 (quoting ECF No. 320, Exhibit 9 ("Naprstek Declaration") at ¶ 7)). Despite Mr. Rasmy's arguments to the contrary, Mr. Diederich's conversations with the witness did not rise to the level of misconduct and instead reflected Mr. Diederich's view that Mr. Rasmy had a weak case and should accept Marriott's settlement offer. Indeed, it seems clear that, except with respect to the claim of retaliation brought against Mr. Stamatis, the jury discredited Mr.

entitled to the "fair and reasonable value of the services" he rendered in this case. Universal Acupuncture Pain Servs., 370 F.3d at 263. However, as stated above, Mr. Diederich seeks only $100,000. Accordingly, the Court hereby grants Mr. Diederich's charging lien of $100,000 of Mr. Rasmy's $400,000 trial award.

For the foregoing reasons, the Clerk of Court is respectfully directed to close ECF Nos. 312 and 316.

SO ORDERED.

Dated: New York, NY
October 31, 2024

JED S. RAKOFF, U.S.D.J.

---

Rasmy's own testimony, let alone his other evidence, and credited all of the defendants' evidence except for the testimony of Mr. Stamatis.